**TEXAS GULF SULPHUR COMPANY, a corporation, Defendant and Appellant,**

v.

**J. R. SIMPLOT COMPANY, a corporation, Plaintiff and Appellee,**
and
**John Hancock Mutual Life Insurance Company, a corporation, Intervener and Appellee.**

No. 22829.

United States Court of Appeals
Ninth Circuit.

Oct. 24, 1969.

794

John D. Hartigan (argued), New York City, Elam, Burke, Jeppesen & Evans, Boise, Idaho, for appellant.

Jess B. Hawley, Jr. (argued), Paul B. Ennis, of Hawley, Troxell, Ennis & Hawley, Boise, Idaho, Carl J. Schuck (argued), of Overton, Lyman & Prince, Los Angeles, Cal., Eberle & Berlin, Boise, Idaho, for appellee.

Before HAMLIN, BROWNING and CARTER, Circuit Judges.

JAMES M. CARTER, Circuit Judge:

This action was started by J. R. Simplot Company, a corporation (hereafter Simplot), to obtain a judgment that Texas Gulf Sulphur Company, a corporation (hereafter Texas Gulf), was obligated under an option clause in a 1963 contract to deliver each year to Simplot 40,000 long tons of sulphur. Texas Gulf's answer denied Simplot's interpretation of the option clause and by affirmative defense claimed a different price was involved or alternately that no price was provided for option sulphur. Texas Gulf also set up a defense that a Robinson-Patman Act violation would result if Texas Gulf was required to provide option sulphur at $11.00(C) per ton.[1]

Thereafter Texas Gulf filed an amended answer and in a counterclaim for the first time asserted fraud in the procurement of the contract. The case was pretried and trial was to commence August 29, 1966. On August 25, Texas Gulf gave notice it was shutting off Simplot's sulphur supply and was rescinding the contract. The rescission was on the ground of fraud by Simplot and that Simplot induced or caused discrimination in violation of the Robinson-Patman Act.

The trial date was vacated and Simplot filed a supplemental complaint. It sought an adjudication concerning (1) Texas Gulf's discontinuance of sulphur shipment, (2) the validity of the purported rescission, (3) Simplot's rights under the contract, (4) judgment compelling performance by Texas Gulf or damages in lieu thereof, and (5) judgment quieting title to real property in which Texas Gulf had security rights under the contractual agreements.

In November 1966 the district judge made an interim order preserving the status quo on the basis of provisional shipments and provisional payments. The case was further pretried, then tried to the district court without a jury. The judgment was in favor of Simplot on all issues. The trial court found that the contract and all the financing instruments were lawful and binding; and that the purported rescission was a nullity on both its asserted grounds of fraud and violations of the Robinson-Patman Act. By judgment Texas Gulf was ordered to perform its sulphur delivery obligations, to reconvey real property when a loan was paid and to comply with all other provisions of the contract. Jurisdiction was retained to make determinations or orders designed to carry out the judgment including those pertaining to the final accounting and the adjustments contemplated by the interim order.

## QUESTIONS PRESENTED

Although the briefs and the record are voluminous, the questions presented for decision on this appeal are in substance,—

1. Whether the evidence supports the findings, conclusions and judgment that (a) Simplot did not induce or cause discrimination violative of the Robinson-Patman Act; (b) the contract was not induced by Simplot's alleged fraud.

2. Whether discrimination on the part of a seller under the Robinson-Patman Act occurs when a contract is executed or as of the date that it is performed.[2]

---

1. (C) and (U.S.) refer respectively to Canadian and United States currency.

2. The pertinent provisions of the Clayton Act (38 Stat. 730) as amended by the Robinson-Patman Act, 49 Stat. 1526, are § 2(a), 15 U.S.C. § 13(a); § 2(b), 15 U.S.C. § 13(b); § 2(e), 15 U.S.C. § 13(e) and § 2(f), 15 U.S.C. § 13(f).

The Clayton Act was enacted October 15, 1914, 38 Stat. 730. § 2 thereof was amended June 19, 1936, c. 592 § 1, 49 Stat. 1526, by the Robinson-Patman anti-discrimination Act. § 2 as amended appears as 15 U.S.C. § 13 with subdivisions (a) through (f).

The Robinson-Patman Act also added other sections which appear as §§ 13a, 13b and 21a of Title 15.

3. Whether Simplot was entitled to the option sulphur provided in the contract.

### THE FACTUAL BACKGROUND

Many of the findings of the district court are unchallenged by Texas Gulf but we view the facts, where disputed, in the light most favorable to Simplot, the prevailing party. We have adopted generally the summary of the facts as prepared by Simplot, since our review of the record shows they are supported by the record.

(1) *The Background as to Simplot and Its Representatives.*

Simplot engages in the manufacture and sale of various chemical fertilizers from Idaho. At all times material, Kilbourne has been Simplot's Vice President in charge of the fertilizer operation and Dunn has been the plant manager. (Findings 3–4.)

To manufacture some of its products Simplot uses sulphuric acid which is either purchased or which is produced from sulphur. This acid is combined and reacted with phosphate rock and other raw materials to produce the fertilizer. If sulphur is used, it is first converted into sulphuric acid. This is done by Simplot in its sulphuric acid plants at its fertilizer complex at Don (near Pocatello), Idaho. These plants went "on stream" in the following years and have the following output and consumption capacities:

| Plant | Year Operation Commenced | Daily Acid Output (Short tons) | Annual Sulphur Consumption (Long tons) |
|---|---|---|---|
| 1 | 1959 | 400 | 40,000 |
| 2 | 1963 | 700 | 70,000 |
| 3 | 1966 | Not less than 1,000 | Not less than 100,000 (Findings 4–5) |

Before it had Plant 1 in 1959, Simplot bought acid produced as a by-product from smelter gases, which could be obtained "very, very cheap." Thereafter, sulphur became available in Idaho at an economic price leading to the construction of the acid plants. Simplot was able to continue purchasing smelter acid to supply some of its needs, but did so on a continually declining basis due to diminishing availability and the unreliability of supply.

Simplot's fertilizer marketing area is defined by paragraph 7.2 of the Contract which specifies it to be "North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, the Panhandle of Texas, and all States west of these States to the Pacific Ocean (except Alaska)." East of the Rockies, however, Simplot must absorb freight and is at a competitive disadvantage because of materially adverse operating and raw material cost factors.

Simplot's fertilizer competitors include Consolidated Mining & Smelting Company operating out of British Columbia and Western Phosphates (a part of Stauffer Chemical) operating from Salt Lake City, neither of which buy sulphur but manufacture their product from cheap smelter acid. As of the time of the trial—but not in 1963 when the transactions in issue took place [Finding 46], another competitor was the El Paso Products Company (El Paso) which had a decided advantage over Simplot because, unlike Simplot, it did not have to transport its phosphate rock to the plant, and had a freight advantage on movement of finished product east.

(2) *The Background as to Texas Gulf and its Representatives.*

Texas Gulf by its own pronouncement, is the "world's largest supplier of sulphur."

As all times material, the sulphur consumed commercially in the United States has been of two types, Frasch (or Gulf Coast) sulphur and recovered sulphur, each produced in widely separated areas. Frasch sulphur is mined from underground deposits in the Gulf Coast area of Texas and Louisiana, while recovered sulphur is obtained from gas fields in Alberta, Canada (with only a small quantity derived from fields in Wyoming). It is "recovered" by a process whereby the hydrogen sulphide in sour natural gas flowing from gas wells is extracted, making the gases "sweet", and thereby saleable. Recovered sulphur is a by-product of the production of natural gas. [Finding 10.]

More than half the 156,000,000 long tons of the United States' Frasch (or Gulf Coast) sulphur from the turn of the century through 1963, has been produced and marketed by Texas Gulf; and, by 1963, Texas Gulf had produced and marketed almost a quarter of the 1.3 million long tons of recovered sulphur produced in Canada.

From the early 1950s Myers has been in charge of and has supervised Texas Gulf's sulphur sales, pricing and marketing worldwide. This included the formulation of policy and final responsibility for the negotiation of sulphur contracts. The Court found that at all times "Myers has been thoroughly experienced in the sale and marketing of sulphur." [Finding 11.]

Gillette, since 1959, has been Myers' assistant sales manager with responsibility for western United States, including the Simplot account. He regularly negotiated and executed sulphur sales for Texas Gulf. He has been in sulphur marketing since 1957 and has kept himself informed on the business and market conditions. At all times pertinent, he too, as the Court found, was thoroughly experienced in the sale and marketing of sulphur. [Finding 11.]

At all material times Texas Gulf collected, analyzed and disseminated information regarding production, sales, inventories, as well as past, present and anticipated market conditions in the sulphur business in the United States, Canada and world-wide. Its personnel continually obtained market information regarding competitive sales and routinely as part of sales planning kept themselves informed on what their competitors were doing, regularly maintaining files on their competitors respecting such data. Texas Gulf has a market research department which collects, analyzes, and disseminates that information in annual reports, press releases and trade journals.

As the Court found, "Texas Gulf was well informed on the industry conditions bearing upon the marketing of sulphur and as to prices, terms and conditions at any given time which sulphur could command on the market." [Finding 14.]

Myers and Gillette travelled extensively throughout the United States and Canada making customer contacts and becoming acquainted with market conditions. They were at all material times, intimately conversant with the sulphur market conditions, and the data in the possession of Texas Gulf. As Myers testified, this was his "big responsibility." [See, Finding 11.]

### (3) The Market Conditions Affecting Canadian Recovered Sulphur.

[Finding 13]. The Canadian recovered sulphur industry, located in the province of Alberta, had its beginnings in the 1950s when natural gas was first produced in substantial quantities. In the early years, the tonnages were insignificant and the industry did not come of age until 1961 when the cumulative total of all recovered sulphur produced in Alberta from the beginnings of the industry, surpassed 1,000,000 long tons.

[Finding 13]. The production of Canadian recovered sulphur, being a by-product of the production of gas, was unique in that the quantity of its production was dictated and controlled by the demand for natural gas, rather than by the sulphur demand. With few exceptions, the pro-

ducers of Alberta recovered sulphur were concerned primarily with the production and sale of oil and gas, which they produced in increasingly higher quantities as larger quantities of gas were shipped to eastern Canada and the United States. The result was that increasingly greater amounts of recovered sulphur were produced.

[Finding 13]. Too, a serious transportation problem contributed to the growing glut. Alberta was landlocked and it was very costly to move the product. The potentially large United States market could not be tapped as there were no favorable freight rates from Alberta. For many rail routes, as from Alberta to Pocatello, Idaho, freight rates were not established for the regular shipment of large quantities of sulphur until as late as 1963.

In 1962 the Free World inventory of sulphur increased over 1,000,000 long tons because the rise in production surpassed the growth in consumption. Most of the added production that year was in recovered sulphur, the Canadian production having doubled to more than 1,-000,000 long tons because in early 1962 four new sulphur recovery plants (including one belonging to Texas Gulf) were brought on stream in Alberta. In 1963 Canadian recovered sulphur production increased more than 20% over the previous year to a total of 1.3 million long tons. This resulted in a further increase in Canadian recovered sulphur inventories. The rapid increases in the production of the product resulted in serious over-supply and severely depressed prices.

When the additional sulphur production came on and the inventory problem became more aggravated, there were "more and more anxious sellers"—to use Myers' words—of the product who had not before been in the sulphur business. These sellers, faced with these unfavorable market and economic conditions, cut prices to move their mounting stockpiles and price emerged as the determining factor in the market of Canadian sulphur.

All of these circumstances produced increased competition. A marked deterioration of the price of Canadian recovered sulphur occurred, and as Myers put it, the market reached its "low point" in the early part of 1963.

The economic factors that led to these chaotic market conditions in the Alberta sulphur industry are detailed in a report published by the Research Council of Alberta in 1962. Gillette sent a copy of this to Dunn (of Simplot) in January 1963 with the comment that "it is generally one of the best studies on Alberta." Following a review of the economic conditions that plagued the Canadian recovered sulphur industry, the report draws the following conclusions:

> "After a rather hectic period of price adjustment the writer would estimate that the price would tend to stabilize somewhere between $8.00 and $10.00 per long ton f. o. b. plant. The price might well dip below this range especially while certain marketers are extending themselves to sell their sulphur. * * *
>
> * * * * * *
>
> "The Alberta sulphur industry is peculiar in that sulphur production will be forthcoming in spite of what may happen; this fact serves to aggravate the situation."

This was because as more and more gas was processed more sulphur resulted. At the time of the transaction, when the low point of the market occurred, the parties contemplated that even lower prices might come about. Gillette wrote April 25, 1963 that he felt "there was a possibility of price decrease." Myers and Gillette told Kilbourne (of Simplot) "they were confident it could not go below $7.50 or else the producers would be forced to stockpile."

By the end of 1963, a reversal of this market trend set in as demand increased in relation to supply, and by 1964 to 1966 vast increases in sulphur demand actually produced shortages of Canadian recovered sulphur.

**(4)** *The Separate Market for the Frasch Sulphur Industry.*

In sharp contrast to the above, were the conditions affecting Frasch (or Gulf Coast) sulphur in its market. As the Court found in Finding 50, in 1963 the price level set by competition for that sulphur "was twice as much as the similar price level for Canadian recovered sulphur", being roughly $10–12 per ton higher, and the disparity between the price levels of the two in their respective market areas continued through the year 1964.

·Because of this wide price disparity and, as Myers testified, because "the high freight rates from the Gulf Coast prohibited transporting the product into the Northwest area" of the United States, Frasch sulphur was not moved into that area (where Simplot was), nor was Canadian recovered sulphur marketed in the United States at distances farther from Alberta than that area.

So, the Court found [Finding 49] that the markets served by the two types of sulphur "were entirely separate and distinct" and "totally isolated from each other", and that at the time of the subject transaction (mid-1963) and later in November, 1964 when Texas Gulf entered into a sulphur contract with the El Paso Company, only Canadian recovered sulphur was available to those buyers. By the same token Canadian recovered sulphur, made so cheap by the conditions just described was not available to the alleged "disfavored" buyers (other than El Paso); and Texas Gulf—as it had to —contracted to sell them the more costly Frasch sulphur.

The so-called "disfavored customers," relied on by Texas Gulf in support of its Robinson-Patman claims were in addition to El Paso with its plant in Idaho, American Agricultural (with its plant in Florida), Armour (with plants in Illinois and Florida), National Phosphate (with its plant in Illinois) and Swift (with its plant in Florida). All (except El Paso) are outside the "North west area" served by Canadian recovered sulphur. [See Finding 49].

In sum, the Court found [Finding 50] "there was no competition between Canadian recovered sulphur and Gulf Coast sulphur as to the transactions in issue."

**(5)** *The Events Leading to the Execution of the Contract.*

Within months after Plant 1 went on stream in 1959 it became necessary to operate it at maximum capacity due to substantially increased fertilizer production requirements. As a result, by early 1960, Simplot contemplated building another acid plant.

[Finding 17]. From the latter part of 1959 on Gillette regularly visited Kilbourne, Dunn and Simplot's sales manager at the Simplot fertilizer plant. From the beginning of those contacts Gillette, Dunn, and Kilbourne had continuing discussions regarding Simplot's expanding needs and Texas Gulf's desire, expressed by Gillette, to sell sulphur to Simplot; Gillette was anxious to sell Canadian recovered sulphur to Simplot. During these contacts Gillette, Dunn and Kilbourne discussed the market conditions and the deteriorating price of Canadian recovered sulphur, including the large over-supply of Canadian recovered sulphur, the increasing availability of the product, and the need for establishment of favorable freight rates from the shipment of the product from Alberta to Pocatello.

[Finding 12]. Shell Canada, Limited (Shell) also was a substantial factor in the production and marketing of Canadian recovered sulphur from Alberta, Canada. Its product was marketed through its sales agents, International Sulphur Ltd., and Canadian Ore Corporation (C.O.C.), acting through their representatives Mickle and, after October 1962, White. Both Mickle and White were experienced in the sale and marketing of the product and were thoroughly conversant with market conditions affecting it.

[Finding 18]. Shell, too, actively pursued Simplot's business. As early as 1960 Mickle conferred with Simplot's plant manager, Dunn, about supplying Canadian recovered sulphur to Simplot and the possibility of Simplot constructing another sulphur acid plant for its increased needs. Mickle was sure he would be able to obtain Shell's approval of a financing of such construction on a basis of amortizing the construction cost by an addition to the price of sulphur that would be supplied Simplot by Shell. As the Court found, this financing "proposal * * * was originated by Mickle" (of International Sulphur). Further discussions on this financing proposal ensued but the project was not pursued further after Kilbourne negotiated a series of agreements with the Anaconda Company for the supply of large quantities of by-product sulphuric acid produced by Anaconda's smelter operations.

[Finding 18]. From that time, however, Shell and its people carried on a persistent course of solicitation of Simplot's sulphur business. As the Court found, Shell and its representatives "were anxious to obtain the Simplot business" and regularly reported to Dunn and Kilbourne on the deteriorating state of the market conditions affecting Canadian recovered sulphur.

[Finding 19]. In 1962 it definitely became necessary for Simplot to expand its fertilizer production and a decision was made to construct another sulphuric acid plant (designated herein as Plant 2). Simplot also decided that the sulphur required to operate the new plant would have to come from the Canadian fields.

[Finding 20]. With those decisions made, Dunn familiarized himself with the current market conditions. The Court found he had reason to and did believe that the price of Canadian recovered sulphur had deteriorated and was deteriorating rapidly; that the product would be available to Simplot at $10 (C) per long ton f. o. b. Alberta; that responsible forecasts were that there would be further declines in that price and that it would stabilize somewhere between $8–$10 (C), and might well dip below that range when marketers were extending themselves to sell their oversupply; that there had been very rapid increases in the productive capabilities of the Canadian recovered sulphur plants since 1962 and the market was flooded with the product and a strong buyer's position existed; and that there was a prospect of sulphur oversupply and low prices. The Court also found Dunn had reason to and did believe that these market conditions placed Simplot in a highly advantageous position to negotiate terms favorable to it as to price, tonnages, financing and other matters; that Shell was eager to enter into a long-term large-volume supply contract with Simplot and would do so at a price of $10 (C) and other favorable terms; and that Shell would provide 100% financing for the construction of Simplot's proposed acid Plant 2, if Simplot entered into a contract with it.

[Finding 21]. Dunn kept his superior, Kilbourne, advised of these matters and of his beliefs in regard to the market conditions, as well as his discussions with the representatives of Shell and Texas Gulf and their activities in soliciting Simplot's business.

[Finding 22]. Kilbourne had justifiable cause to and did believe and have confidence that the market for Canadian recovered sulphur was in a distressed condition; that a strong buyer's position existed; that Simplot was in a highly advantageous position to negotiate terms favorable to it as to price, tonnages, price protection, financing and otherwise; and that Simplot in exchange for a long-term, large-volume supply contract could negotiate a sulphur supply contract with either Shell or Texas Gulf at $10 (C) per long ton f. o. b. Alberta, with the price firm against increases for the first five years and with protection against any lower prices that were granted to any competitor of Simplot, and that Simplot could obtain 100% financing from Shell for the construction of the proposed acid plant.

**(6)** *The Negotiation and Execution of the Contract and Financing Instruments.*

[Finding 23]. In early 1963 Kilbourne began negotiations with White (representing Shell) and Myers and Gillette (representing Texas Gulf) for a long-term sulphur supply contract and financing to construct a new acid plant (Plant 2). The negotiations continued until April 23, 1963 when Simplot and Texas Gulf closed the deal with final details and formal instruments to be worked out.

Because the content of the negotiations and the events connected with them lie at the heart of Texas Gulf's Robinson-Patman and fraud charges, we shall, to avoid duplication, present those facts in connection with the related argument below refuting those claims.

It suffices here to state that on June 14, 1963, the parties executed the Contract [Finding 24]. Briefly, the Contract has the following pertinent provisions:

(a) The term is for 10 years and thereafter from year to year until cancelled by either party on written notice;

(b) The product is Texas Gulf Canadian recovered sulphur to be delivered at its plants in Alberta;

(c) The quantity of both Basic Sulphur and Option Sulphur is covered in one clause reading:

"3.1 [Basic Sulphur] A quantity of sulphur ordered by the Buyer for shipment to and consumption in the Plant, such quantity to be 70,000 tons or actual tonnage consumed by Buyer in the Plant, whichever is smaller, during each yearly period; [Option Sulphur] however, Buyer, at its option, may purchase from the Seller 40,000 tons in excess of said tonnage during each yearly period."

(d) The price is contained in Article "VI. PRICE", reading:

"6.1 The price per ton of crude dry and/or liquid sulphur shall be Eleven and 00/100 Dollars ($11.00) Canadian Funds free on board cars Seller's

plants at Windfall, Alberta and/or at Seller's option Okotoks, Alberta."

(e) There are price adjustment provisions in the article designated "VII. PRICE ADJUSTMENT", which so far as pertinent here, provides (i) that Texas Gulf may on 30 days advance notice increase prices (but may not do so before January 1, 1969), in which event Simplot may elect not to accept the increase which would give Texas Gulf the option to revoke the increase or terminate the agreement [§ 7.1]; (ii) the seller guarantees its prices shall not be greater than that at which it sells "Canadian sulphur" to any of its customers operating in Simplot's marketing area above described [§ 7.2]; and (iii) the so-called "meet the release" clause, that if Simplot is in good faith offered a lower price for quantities greater than 20,000 tons, Texas Gulf has the option of either reducing its price or permitting Simplot to cancel but until the end of 1968 it need only reduce the price by 50% [§ 7.3] and;

(f) There is a requirement that for Texas Gulf's convenience, Simplot had to construct (partly at its expense), operate and maintain a liquid sulphur storage tank to hold the shipments and Texas Gulf agreed to pay Simplot $1.00 (U.S.) per ton of sulphur shipped as a storing and handling charge. [§ 8.1]

The rest of the transaction involved the financing arrangements. These were concluded in mid-August, 1963, when the parties (including John Hancock) executed various instruments for financing the construction of Plant 2. [Finding 35]. These involved:

(a) A release by John Hancock of its security interest under a mortgage affecting in part the real property on which the Plant 2 was being constructed;

(b) Typical conveyance and leaseback instruments between Texas Gulf and Simplot whereby the former advanced $1,650,000, the repayment plus interest at 5% per annum compounded quarterly to be made in monthly installments, calculated at $1.50 per short ton of all acid consumed or sold by Simplot (subject to

minimum annual payments of $213,675), with provision for revesting of the legal title in Simplot upon payment of the loan plus interest;

(c) A personal guarantee by J. R. Simplot, the president; and

(d) A mortgage by Simplot to John Hancock of its rights under the instruments, as security for its underlying capital financing having no relation to the construction of Plant 2.

[Findings 36, 37 and 40]. The Court found that these instruments (referred to as the Financing Instruments) constitute an integral part of a single transaction and were intended by the parties to be and were in fact only a security device under which Texas Gulf held and is holding legal title to the property and the plants thereon as collateral to insure repayment by Simplot of the unreimbursed amount of the $1,650,000 loan plus interest; that Simplot at all times fully performed all of its obligations in connection with the financing and at the time of the trial had repaid all the loan except approximately $7,000 and has shown its ability and willingness to make the full repayment.

The Court further found [Finding 38] that at all times Simplot has been in possession of the property; that it caused construction of Plant 2 to be completed; and in 1966 it constructed Plant 3 adjacent to Plant 2 on the westerly portion of the real property at a cost to it of approximately $2,000,000; and that Plants 2 and 3 have at all times been operated by Simplot as an integral part of its fertilizer manufacturing complex.

In addition the Court found [Finding 39] that continued possession of the real property and continued operation by Simplot of Plants 2 and 3 is vital and indispensable to Simplot's production and continuance in the fertilizer business and to the protection of the security rights of John Hancock, and that Appellees would sustain immediate and irreparable damage and injury and have no adequate remedy at law if such possession and use were interfered with or if Texas Gulf should refuse to release and reconvey the property to Simplot.

Our review of the record convinces us that the evidence fully supports the findings and judgment of the trial court, (1) that Simplot in no way induced or caused any discrimination in violation of § 2 of the Robinson-Patman Act, 15 U.S.C. § 13; (2) that there was no reason why Texas Gulf could not have given exactly the same favorable terms to any of its customers and potential customers; (3) that no prohibited discrimination occurred or was likely to occur and that the difference between the subject transactions and those with the so-called less favored customers were not the result of any intent to discriminate in the market areas involved or elsewhere; (4) that the transaction was not induced by fraud or misrepresentation and that Texas Gulf sustained no damage or injury on account of its fraud charges; (5) that Simplot was entitled to exercise its annual option for an additional 40,000 long tons of Option Sulphur.

Actually the case is on final analysis a simple one. Texas Gulf, a giant in the sulphur field, was faced with an ever increasing supply of recovered Canadian sulphur, a by-product of its production of natural gas. Because it was a by-product, it could not be quantitatively controlled. This Canadian sulphur could not be sold out of the competitive area in which it was produced, and was not in competition with Frasch (Gulf Coast) sulphur produced in another competitive area.

Texas Gulf sought a buyer and, fully advised of all facts concerning the market, contracted with Simplot, a David compared to the Goliath of Texas Gulf. Simplot secured a favorable long time contract but never requested that it alone receive its favorable contract terms, nor did the contract so provide, nor was there any discrimination as to other existing buyers in the competitive area.

After the execution of the contract the demand for Canadian sulphur rose and Texas Gulf decided it had made a bad

bargain. Assuming the role of the poor widow wronged by the town banker, it asserted the claim that it was induced and caused to grant price discrimination violative of the Robinson-Patman Act, and that the contract was induced by fraud.

Texas Gulf's contentions are utterly without merit and we could well conclude our opinion with this paragraph. However, because of the importance of the controversy, the lengthy record and the extensive briefs filed by both parties, we proceed to discuss the issues in more detail. We affirm.

## I.

### THE ROBINSON-PATMAN ACT CLAIM

Texas Gulf asserts that (1) Simplot violated the Robinson-Patman Act, and (2) such a violation justifies its rescission and refusal to perform. We disagree with the first assertion and, therefore, find it unnecessary to consider or decide the second—whether a seller in Texas Gulf's position may assert a violation of the Robinson-Patman Act against its own buyer.

#### A. *No unlawful price discrimination was present in this case.*

On the facts presented by Texas Gulf, Simplot is actually charged with a violation of § 2(f) of the Robinson-Patman Act. Section 2(f) provides: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." The gist of Texas Gulf's claim is that Simplot, with guilty intent, forced Texas Gulf into commitments to violate Section 2(a) of the Robinson-Patman Act for the purpose of causing illegal competitive injury to Simplot's competitors. Simply stated, § 2(a) prohibits a seller from granting a price discrimination to a buyer if the discrimination may substantially lessen competition.

A review of the evidence shows that Texas Gulf's claim fails on two counts.

First, it is not shown that Simplot knowingly induced or received a discriminatory price. Second, it is not shown that the effect of the alleged discrimination may have been to substantially lessen competition.

1. *Simplot did not induce or receive a discriminatory price.* The leading case interpreting § 2(f) is Automatic Canteen Co. v. F. T. C., 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953). There the F.T.C. had found a § 2(f) violation, holding that a prima facie case of violation can be inferred from proof that the buyer had received lower prices on like goods "well knowing that it was being favored over competing purchasers." The Supreme Court set aside the F.T.C. order, holding that despite the fact Automatic Canteen knew its prices were as much as one-third lower than those of any of its competitors, and despite a clear showing it had exerted its dominant position to pressure lower prices, nevertheless more was needed to establish the inference of "guilty knowledge." The Court required proof that the sale would violate § 2(a) and proof that the buyer knew this and that "knowing full well that there was little likelihood of a defense for the seller, [the buyer] nevertheless proceeded to exert pressure for lower prices" than those known to be given his competitors, 346 U.S. 74–79, 73 S. Ct. 1027.

Fred Meyer, Inc. v. F. T. C., (9 Cir. 1966) 359 F.2d 351, rev. on other grounds, (1968) 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 applied the *Automatic Canteen* doctrine and is not to the contrary. It was in part, a § 2(f) case, where F.T.C. findings were affirmed that Fred Meyer had knowingly induced illegal price discriminations and promotional allowances from its suppliers. "Meyer itself carefully required of its special promotion suppliers that 'Offer Must be Exclusive at Fred Meyer During the 4 Week Period.'" 359 F.2d at 367. Fred Meyer (a) demanded more favorable payments and allowances than those available to its competitors, and (b) knew

it was receiving more favored treatment than its competitors. Fred Meyer brought about the different prices by "an accomplished intent to discriminate." 359 F.2d at 357.

■ Thus, in our case, Texas Gulf had the burden of establishing that Simplot knowingly induced or received a discrimination in price which was prohibited by § 2(a) of the Act. The findings supported by the evidence, show that Texas Gulf did not carry this burden. The trial court found that Simplot did not solicit or induce any illegal discrimination and there was no intent on the part of Simplot to induce a discrimination.

In more detail the findings were (a) that Simplot did not request or suggest, nor did Texas Gulf state or suggest that Texas Gulf should or would *not* give similar or as favorable a transaction to any other customer or prospective customer; [Finding 44]; (b) that there was no express or implied agreement that Texas Gulf would *not* extend to any of its customers any of the terms negotiated between Texas Gulf and Simplot or that anyone else would receive any less favorable transactions. [Finding 44]; (c) that Simplot merely attempted to obtain the best deal it could consistent with market conditions, and did not directly or indirectly attempt to obtain any advantage over any of its fertilizer competitors, or any more favorable deal than its competitors, or did not attempt to obtain, induce or receive any discrimination violative of the Robinson-Patman Act; (d) that Simplot had no reasons to believe that Texas Gulf would give less favorable terms to any other customer or would discriminate against any customer; [Finding 45]; (e) that there was no reason why Texas Gulf could not have granted the same terms and conditions to other customers and that Texas Gulf was under no restraint with respect thereto; [Finding 44]; (f) that the transactions in issue, including those with the alleged disfavored customers were isolated and non-recurring transactions, each negotiated in the light of the particular needs

of the parties and in response to market conditions existing at the time each was negotiated and executed. [Finding 53.]

Texas Gulf places heavy reliance on a theory of "inherent discrimination." This claim focuses on paragraphs 7.1, 7.2, and 7.3 of the sulphur supply contract, the Price Adjustment section. Essentially, Texas Gulf contends these terms are discriminatory per se. This position is no doubt made mandatory by the thoroughness of the trial court's findings as to the lack of objective evidence of discriminatory agreement between the representatives of Texas Gulf and Simplot.

An examination of the price terms reveals that Texas Gulf's contention is without merit. The trial court found the basic price to Simplot for sulphur was $11.00 (C) per ton f. o. b. at Alberta, Canada. It was the only price subject to adjustment under Art. VII, paragraphs 7.1, 7.2 and 7.3 of the contract. It was the price at which Texas Gulf invoiced Simplot in amounts exceeding $1,700,-000.00. The trial court further found this price was not reduced by the $1.00 (U.S.) per ton payment to Simplot provided for in paragraph 8.1. The $100 (U.S.) payment came from an idea originated by Texas Gulf and was included in the contract for the convenience of Texas Gulf. It was for the convenience of Texas Gulf since Simplot bore about one-third of the capital cost for constructing the liquid storage tank on its property which it committed itself to operate and maintain and "it was contemplated and intended by the parties that the performance by Simplot of such obligations would operate as a benefit and convenience to Texas Gulf" and that such benefits resulted. [Findings 27, 29]

■ The findings were supported by the evidence. It was to the benefit of Texas Gulf for Simplot to have facilities ready to receive Texas Gulf deliveries and to avoid hang-ups as to when and where deliveries could be made.

Paragraph 7.2 of the contract merely guaranteed Simplot that its price should not be greater than that at which Texas

Gulf sold Canadian sulphur to Simplot's competitors in the market area defined in the contract. This was the same market area that the trial court found was the area in which Simplot competed. Thus Simplot had a contract for a fixed supply of sulphur at $11 (C) per ton *or* at the price which Texas Gulf might sell Canadian sulphur to any of Simplot's competitors.

The record shows that the parties, prior to the execution of the contract, contemplated a possible further price decline. Both Kilbourne (Simplot) and Gillett (Texas Gulf) so testified.

There were no disfavored customers at the date of the execution of the contract on June 5, 1963. El Paso made its contract on November 24, 1964. It was not in the fertilizer business on June 5, 1963. Its contract was executed under drastically changed market conditions. *All* the other so-called disfavored customers National Phosphate (contract dates 9/8/61 and 6/17/64), Swift (contract dates 12/11/62 and 12/27/63), Armour (contract date 9/30/63), American Agricultural (contract date 3/30/64) were admitted by Myers of Texas Gulf (R. 1189–90, 1222–1226) to be in no position to get the cheaper Canadian sulphur because it was not shipped to their areas in the United States.

Price protection against market upswings are commonplace in the American industrial scene and are not per se illegal. The "supply" or "requirements" contract by which a manufacturer assures itself a supply of material for a definite price running over a period of time as a necessary part of our economic system. We can take judicial notice of the general existence of such contracts in our economy. These may vary in the period of time they cover or as to the commitment, if any, as to the amount of goods to be supplied in the future. Some are optional in operation, i. e., if the buyer orders, he will be supplied specified goods at a set price.

Obviously all the dealings on the Futures Commodity Market would be out-lawed if appellants' contentions are correct. On that market individuals buy commodities at a certain price to be delivered at a future date. On the future date market conditions may be entirely different and persons buying on that date may buy at unfavorable prices compared with prices paid by persons who bought earlier, but no legal wrong or damage occurs.

The record shows that Texas Gulf used clauses protecting against price increases in most, if not all, of its contracts with purchasers. The period of protection against price increase varied depending on the market conditions existing when the contract was executed.

The case law indicates the limited circumstances under which agreements guaranteeing future prices may be illegally discriminatory. Only if the agreement in question provides that some or all competitors will *not* be given the same prices and terms, can a violation be found.

Directly in point is Chicago Sugar Co. v. American Sugar Refining Co., 176 F. 2d 1 (7 Cir. 1949) cert. denied 338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584 (1950). A contract similar to the Texas Gulf contract was involved. The court held there was no violation of the Robinson-Patman Act, since the plaintiff had been accorded the same treatment as competitors when the contracts were made. No secret terms or inducements had been offered or granted to any of his competitors and all customers had been treated alike with similar prices, similar terms and similar conditions.

Cannon Mills Co. v. F. T. C. Dkt. #7494 (I.D. Dec. 3, 1963) is also directly in point. The contracts involved specified a quantity of merchandise to be purchased over a fixed period of time at the price set in the contract. If the price declined the buyer was to get the benefit of the price decrease. If the price increased the buyer was protected by the contract price. The hearing examiner rejected a contention that price discrimination occurred at time of delivery and dis-

missed the complaint. He stated: " * * the price at the time of the contract was the price available to all customers at the time the contract obligation was incurred * * * [T]here is no evidence that contracts were available to some customers and not available to others." (FTC Docket #7494 at page 12.)

█ The validity of price protection provisions for the purpose of the Robinson-Patman Act must be evaluated at the time the contract is made. Where competitors similarly situated are treated alike at the time of the transaction, there is no violation of the Robinson-Patman Act in contracts containing price protection provisions. See Chicago Sugar Co. v. American Sugar Ref. Co., supra.

Appellants rely on Corn Products Refining Co. v. F. T. C., (1945) 324 U.S. 726, 740, 65 S.Ct. 961, 89 L.Ed. 1320, affirming the Seventh Circuit in 144 F.2d 211, and F. T. C. v. A. E. Staley Mfg. Co., (1945) 324 U.S. 746, 750, 65 S.Ct. 971, 89 L.Ed. 1338. These cases stand for the proposition that a seller may not in similar transactions, under similar market conditions, at substantially the same time, grant to one customer-buyer price protection by way of options and withhold a like form of price protection to a competitor of the other buyer. This is clearly not the case here.

(2) *The alleged discrimination did not substantially lessen competition and did not involve comparable transactions.*

§ 2(a) of the Act, 15 U.S.C. § 13(a) prohibits price discrimination by a seller only "where the effect of such discrimination may be substantially to lessen competition." Similar language is not contained in §§ 2(b) and 2(e), 15 U.S.C. §§ 13(b) and 13(e) but the cases have carried the language over from § 2(a) into succeeding sections.

█ The cases uniformly hold that § 2 of the Act, 15 U.S.C. § 13, only prohibits price discrimination by a seller where the "effect" causes or may cause forbidden competitive injury. 15 U.S.C. § 13(a);

Tri-Valley Packing Assoc. v. F. T. C., (9 Cir. 1964) 329 F.2d 694, 703; Balian Ice Cream Co. v. Arden Farms Co., (9 Cir. 1955) 231 F.2d 356, 367–368, cert. denied 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856 (1956); American Oil Co. v. F. T. C., (7 Cir. 1963) 325 F.2d 101, 104, cert. denied 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964); Minneapolis-Honeywell Reg. Co. v. Federal Trade Com'n, (7 Cir. 1951) 191 F.2d 786, 790, cert. granted 342 U.S. 940, 72 S.Ct. 552, 96 L.Ed. 699 (1952) cert. dismissed 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245 (1952); Alexander v. Texas Co., (W.D. La.1958) 165 F.Supp. 53, 56; Kraft-Phenix Cheese Corp., (1937) 25 F.T.C. 537, 543; Rowe, Price Discrimination Under the Robinson-Patman Act (1962), pages 139, 186 et seq.

█ A discrimination under the Robinson-Patman Act does not come about where differences in price terms or conditions between several transactions result from diverse market conditions rather than from an intent to discriminate. The trial court found that no discriminations occurred or were likely to occur because the differences between the various contracts were not the product of an intent to discriminate but resulted from diverse market conditions in the absence of a prohibited competitive effect.

The Supreme Court recently stated in F. T. C. v. Borden Co., (1966) 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153, that the Robinson-Patman Act:

" * * * proscribes unequal treatment of different customers in *comparable transactions*, but only if there is the requisite effect upon competition, actual or potential." (Emphasis added) (383 U.S. 637, at 643, 86 S.Ct. 1092, at 1097).

The Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) states:

"The prohibitions of the statute presuppose discriminatory treatment of customers in analogous transactions involving similar goods under comparable market conditions at approximate-

ly the same time." (Report etc., at 178).

and that:

" * * * any anti-price discrimination statute designed to check unfair disparity in commercial treatment must—short of enacting a comprehensive system of universal price control —come into play in reasonably equivalent business transactions involving the sale of nearly identical goods." (Report etc., at 157.)

In Antitrust Developments 1955–1968 (1968)—prepared by the Section of Antitrust Law of the American Bar Association and published by the ABA as a supplement to the above Attorney General's Committee report—the foregoing comments are not modified, and there is a reaffirmation of the basic principle that "the anti-price—discrimination law is confined to a comparison of two business transactions reasonably comparable * * *" (Antitrust Developments 1955–1968, at 120).

The authorities and decisions in this field are to the same effect, Bruce's Juices v. American Can Co., (1947) 330 U.S. 743, 755, 67 S.Ct. 1015, 91 L.Ed. 1219; Fred Meyer, Inc. v. F. T. C., (9 Cir. 1966) 359 F.2d 351, 357, rev'd on other grounds, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968); Tri-Valley Packing Assoc. v. F. T. C., (9 Cir. 1964) 329 F.2d 694, 709; Valley Plymouth v. Studebaker-Packard Corporation, (S.D.Calif. 1963) 219 F.Supp. 608, 610–611; Atalanta Trading Corp. v. Federal Trade Com'n, (2 Cir. 1958) 258 F.2d 365, 371–372; Chicago Sugar Co. v. American Sugar Ref. Co., (7 Cir. 1949) 176 F.2d 1, 7, cert. den. 338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584 (1950); Shoenberg Farms, Inc. v. Denver Milk Producers, Inc., (D. Colo.1964) 231 F.Supp. 266, 267; Castlegate, Inc. v. National Tea Company, (D. Colo.1963) 34 F.R.D. 221, 229–230. Rowe, Price Discrimination Under the Robinson-Patman Act (1962) pages 45, 48–51. Rowe, goes further and classifies the need for reasonably contemporaneous and "reasonably comparable transactions 'un-der similar circumstances' " as a "Jurisdictional Requirement" under the Act (Rowe, supra, 48).

This court in *Tri-Valley Packing Association*; supra, laid down the same criteria—viz, * * * "customers who are in functional competition in the same geographical area, and who buy the seller's products of like grade and quality within approximately the same period of time, are in actual competition with each other in the distribution of these products." 329 F.2d at 709.

Here the trial court found "there was a material and substantial change and difference" in the market conditions and that the other dealings "were isolated and non-recurring transactions, each negotiated in light of the particular needs of the parties and in response to market conditions existing at the time each was negotiated and executed." [Findings 47, 53.]

Texas Gulf assumes in its argument that the significance of different market conditions surrounding alleged less favorable transactions is related only to the so-called "changing conditions" proviso of § 2(a) of the Act, 15 U.S.C. § 13(a) and it argues further that the proviso only "permits ad hoc decisions in response to defendants market conditions." But the "changing conditions" proviso only comes into play when there are "commercial transactions otherwise vulnerable as price discrimination," and it only operates as an exemption at that point. Report of the Attorney General's National Committee to Study the Antitrust Laws, (1955) pages 177–178.

The trial court below found that no prohibited discrimination, the predicate for the application of the "changing conditions" proviso, ever existed. In summary the trial court found that there was no prohibited discrimination where the differences in challenged business transactions flowed from a response to different market and economic conditions rather than from an intent to discriminate.

We summarize the findings which are amply supported by the evidence:

(a) That the sulphur marketed by Texas Gulf is sold to users receiving shipments on long term contracts and none of the transactions in issue involve spot sales of individual sulphur shipments. [Finding 42.]

(b) That these sulphur contracts upon their execution fix the rights and obligations of the parties including the price and all of the terms such as the circumstances under which the price may be increased and the rights, if any, of the buyer to a lower price should one be extended to a competitor. [Finding 42.]

(c) Each contract in issue is a separately negotiated transaction based and dependent upon the particular and peculiar market conditions, transportation factors and competitive pressures involved in each individual case. [Finding 42.]

(d) That El Paso is the only so-called disfavored customer with which Texas Gulf has contracted for the supply of Canadian recovered sulphur, but it was not in the fertilizer business in 1963 when the Simplot transaction occurred and neither party had any information El Paso intended to enter that business, and the Texas Gulf-El Paso transaction did not occur until November 1964, more than 17 months after the contract in suit and shipments under the contract did not begin until August 1965 [Finding 46.]

(e) That there was a material change and difference in market conditions affecting the Canadian recovered sulphur between the time of the Simplot transaction in mid-1963 and the El Paso transaction in November 1964. The two were not comparable or analogous and the relative positions of the buyers and sellers at those different times were materially and substantially unlike. [Finding 47.]

(f) That the differences between those transactions were not the result of any intent to discriminate against El Paso but rather were caused by the change in market conditions affecting Canadian recovered sulphur. [Finding 47.]

(g) That the effect of Texas Gulf's transactions with Simplot and El Paso was not and will not be to substantially lessen competition or tend to create a monopoly in any line of commerce or to injure, destroy or prevent competition with Simplot. [Finding 47.]

(h) That the other asserted disfavored transactions with Swift, National Phosphates, American Agricultural and Armour involved Gulf Coast sulphur, not the Canadian recovered sulphur, that though at the time of the Simplot transaction the price level of Canadian recovered sulphur was half that of Gulf Coast sulphur, it was not available in that part of the United States where such other "disfavored customers" were, and that the geographical markets in which the two sulphurs sold were totally isolated from each other and the two did not compete with each other. [Findings 49, 50.]

B. *There was no Discrimination as to Services or Facilities.*

What we have heretofore said likewise applies with equal force to Texas Gulf's claims that the findings of the trial court were clearly erroneous as to its attempt to obtain a rescission of the lease as a supposed discriminatory "facility" prohibited by § 2(e) of the Act, 15 U.S.C. § 13(e). The prerequisite of an intent to cause a discrimination and the comparability of market conditions as to challenged transactions which apply to the other subsections of § 2 apply with like force to § 2(e) violations. See the cases, supra, dealing with other subsections of § 2.

In this aspect of the case Texas Gulf claims that the disfavored customers were El Paso and Armour. However, Myers of Texas Gulf conceded that Armour was not in competition with Simplot. We are left with the contention that El Paso, whose contract was executed about 17 months after the Simplot contract, was the customer discriminated against. This contention has no more

merit than the other contentions of Texas Gulf based on § 2(a) and (f), 15 U.S.C. § 13(a) and (f).

The trial court made other findings that likewise defeat the claim.

■ The court found that the Lease was but one of several instruments forming an integral part of the loan and security phase of the dealings. [Findings 35–40.] The financing was a basic part of the entire transaction for without the acid plant Simplot would have had no need for the sulphur. Thus no "facility" —reading that subsection literally as Texas Gulf would have us do—was involved.

The trial court made conclusions of law in like tenor to the various findings referred to above and finally found and concluded that the Contract and Financing Instruments in all respects were lawful and binding, that the purported rescission was a nullity, that Simplot was entitled to full performance from Texas Gulf under those instruments, that there had been no violation of the Robinson-Patman Act and there will be none under the instruments in question, that Simplot did not knowingly induce or receive any discrimination prohibited by the Act, and that Texas Gulf has sustained no damage or injury under the antitrust laws nor does it have any right to rescind the instruments. [Conclusions 2–8, 10–17.]

We have reviewed the record and it supports the findings and conclusions of the trial court. It would serve no useful purpose to review all the evidence, much of it in conflict. Suffice it to say that Gillette, who handled the transaction for Texas Gulf as Assistant Sales Manager, testified that his dealings were with Kilbourne for Simplot and that Kilbourne never asked that Gillette *not* give a similar deal to anyone else and no agreement written or otherwise existed that Texas Gulf *not* give a similar deal to anyone else. Meyer, Gillette's superior, confirmed the action by his testimony.

Based on this record we reject the contentions of Texas Gulf that purported violations of § 2(a), (e) and (f) of the Act, 15 U.S.C. § 13(a), (e) and (f), either existed or justified the purported rescission.

## II.

### TEXAS GULF'S CLAIM OF FRAUD

Texas Gulf alternatively bases its claimed rescission on fraud and misrepresentation by Simplot.

■ This contention is subject to easy disposition. The trial court found against Texas Gulf on all elements of the fraud charges, including representation, materiality, inducement, reliance and damage; and further found that Texas Gulf entered into the contracts motivated by its own independent business judgment in the light of its own particular needs and desires. [Findings 9–24, 31, 35–41, 47–50, 53 and Conclusions 2–3, 9, 12, 16, 21–22.]

Much of the evidence supported the findings and are included in the statement of the facts of the case, supra.

In addition the court specifically found:

(a) That at no time during the course of the negotiations or in connection with the execution of the Contract or the Financing Instruments, did any Simplot representative (including Kilbourne) make any false or fraudulent misrepresentations. Finding 41.]

(b) That Texas Gulf was not in any way induced into executing those instruments by reason of, nor did it rely on, any misrepresentations or fraud by any Simplot representative. [Finding 41.]

(c) That "Texas Gulf was not misled in any way by any statement made by Kilbourne". [Finding 41.]

(d) That Texas Gulf and its people were at all times "highly sophisticated and knowledgeable in the marketing and contracting for the sale of sulphur and were fully conversant with the true facts and market conditions then existing in the Canadian recovered sulphur industry". [Finding 41.]

(e) That in executing the documents " * * * Texas Gulf was motivated by its own independent business judgment, a desire to reduce its over-supply of sulphur and its eagerness to obtain Simplot as a customer on a long-term, large-quantity supply contract". [Finding 41.]

(f) "That all aspects of the transactions, in issue in this case, between the parties were the result of bargaining in light of the respective needs and positions of the parties, and in response to the market conditions then existing * * *." [Finding 53.]

The Conclusions were that the Contract and Financing Instruments were in all respects lawful and binding, that the purported rescission was of no force and effect, that Simplot was not guilty of any fraud, that Texas Gulf was not induced to execute the instruments by any fraud and has sustained no damages, that Texas Gulf had no right to rescind on account of its claims, that it was required to perform its obligations under the instruments and that appellees Simplot and John Hancock were entitled to have appropriate decrees for specific performance and to have their titles and rights quieted as against the adverse claims made by Texas Gulf. [Conclusions 2–22.]

The findings are supported by the evidence and are not clearly erroneous. We only add the comment that the trial court heard the testimony of all the principals as well as their contemporaneous memorandums of conversations. The trial court not only found no fraud but also found that Texas Gulf representatives were highly sophisticated as to market conditions and were not *misled* by any statements of Simplot and did not *rely* on any such representation. The motivating facts for Texas Gulf's entry into the contract were obviously its over supply of Canadian sulphur and its desire to obtain Simplot as a long term, large quantity buyer of that sulphur.

## III.

## THE OPTION SULPHUR DISPUTE

Simplot insists that it was and is entitled to delivery of 40,000 long tons of sulphur yearly under the option clause of the contract. Texas Gulf maintains that the option was not meant to cover sulphur ordered for use in the third Simplot sulphur plant. Alternatively Texas Gulf claims that if such use were authorized by the contract, the agreement would be a clear violation of § 2(a) of the Robinson-Patman Act. This latter contention merely restates the argument and citation used to attack the main sulphur contract. Our findings on that point apply here as well. We confine our discussion, therefore, to the matter of contractual interpretation.

The Quantity and Terms section of the contract contains the option provision:

"3.1 A quantity of sulphur ordered by the Buyer for shipment to and consumption in the Plant, such quantity to be 70,000 tons or actual tonnage consumed by Buyer in the Plant, whichever is smaller, during each yearly period; however, Buyer, at its option, may purchase from the Seller 40,000 tons in excess of said tonnage during each yearly period."

Simplot maintains that the option provision does not specify any plant at which the 40,000 tons must be used. Texas Gulf asserts that this language must be interpreted in light of the following introductory provisions of the contract.

"1. Whereas, Buyer is the lessee of a sulphuric acid plant of approximately 700 tons per day capacity now being constructed at Don, Idaho, by Bannock Chemical Company, and

2. Whereas, Buyer desires to purchase from Seller sulphur for use and consumption in such plant.

## WITNESSETH

Seller agrees to sell and deliver and Buyer agrees to buy and receive at a

sulphuric acid plant to be constructed in 1963 on premises leased by Buyer at Don, Idaho, hereinafter called the "Plant," the sulphur hereinafter mentioned, on the following terms and conditions: * * *."

Texas Gulf reads this language with that of the Quantity and Terms section to reach the conclusion that the 40,000 ton option could not be exercised to provide sulphur for the third Simplot plant.

The trial court heard the witnesses, considered the oral and documentary evidence and rejected Texas Gulf's interpretation of the option provision. It found: (1) All of Simplot's acid plants were part of "a single interconnected, nonseparable and integrated manufacturing unit." (2) Texas Gulf routinely included option sulphur provisions in its sulphur supply contracts. (3) The parties had intended that the 40,000 tons could be used in any plant which Simplot operated at the time the need for the option sulphur arose. (4) Payment for the option would be governed by the price provision for the main sulphur contract.

These findings are not clearly erroneous as Texas Gulf contends. On the contrary they logically follow from the evidence presented to the trial court. We note that Texas Gulf's negotiators were experts in the drafting of long term sulphur supply contracts. Had they so intended, the Quantity and Terms section would have been conditioned to limit use of the option sulphur to a particular unit. The failure to do so doubtless reflected the belief that the 40,000 tons could be used in any Simplot plant.

Texas Gulf's interpretation of the contract would place a heavy premium on the form of Simplot's expansion. An expansion of Plant 2 or an increase in its productive capacity without expansion would allow the option to be exercised. Construction and denomination of a separate facility, however, would be outside the option. It is far more reasonable to assume that Texas Gulf had no interest in the manner in which the option tonnage was used in Simplot's operations.

## IV.

### THE INTERVENER'S CLAIM

John Hancock Mutual Life Insurance Company has entered the case in the posture of intervener-appellee. Hancock presently holds a mortgage on part of the property of Simplot and Ruby Company. Hancock has filed a brief to alert the court to its interest in any decision which might alter the decision of the trial court. However, since our decision affirms all aspects of the trial court's findings of fact and conclusions of law, we need not evaluate the intervener's specific contentions.

## V.

### TEXAS GULF'S DAMAGES

Texas Gulf has asked for $1,328,158.85 damages for Simplot's fraud and its violation of the Robinson-Patman Act. We have found no violation on the part of Simplot and accordingly need not consider the damage claim. The trial judge correctly decided the issue.

The judgment is affirmed.