**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| U.S. WHOLESALE OUTLET & DISTRIBUTION, INC.; TREPCO IMPORTS AND DISTRIBUTION, LTD.; L.A. INTERNATIONAL CORPORATION; CALIFORNIA WHOLESALE; YNY INTERNATIONAL, INC.; EASHOU, INC., DBA San Diego Cash and Carry; SANOOR, INC., DBA L.A. Top Distributor, | No. 21-55397 |
| | D.C. No. 2:18-cv-01077-CBM-E |
| *Plaintiffs-Appellants*, | ORDER AND AMENDED OPINION |
| v. | |
| INNOVATION VENTURES, LLC; LIVING ESSENTIALS, LLC, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted June 7, 2022
Seattle, Washington

Filed July 20, 2023
Amended December 22, 2023

Before:  Ronald Lee Gilman,[*] Sandra S. Ikuta, and Eric D.
Miller, Circuit Judges.

Order;
Opinion by Judges Miller and Ikuta[**]
Partial Concurrence and Partial Dissent by Judge Gilman;
Partial Dissent by Judge Miller

**SUMMARY**[***]

**Robinson-Patman Price Discrimination Act**

The panel filed (1) an order amending its opinion, denying a petition for panel rehearing, and denying a petition for rehearing en banc; and (2) an amended opinion affirming in part and reversing in part the district court's judgment after a jury trial and a bench trial in favor of the defendants in an action brought under the Robinson-Patman Price

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] Judge Ikuta authored Part III.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Discrimination Act by U.S. Wholesale Outlet & Distribution, Inc., and other California wholesale businesses.

Parts I and II, authored by Judge Miller

Defendant Living Essentials, LLC, sold its 5-hour Energy drink to the Costco Wholesale Corporation and also to the plaintiff wholesalers, who alleged that Living Essentials offered them less favorable pricing, discounts, and reimbursements in violation of the Robinson-Patman Act. On summary judgment, the district court found that the wholesalers had proved the first three elements of their section 2(a) claim for secondary-line price discrimination. At a jury trial on the fourth element of section 2(a), whether there was a competitive injury, the jury found in favor of defendants. At a bench trial on the wholesalers' section 2(d) claim for injunctive relief, the court ruled in favor of defendants.

Affirming in part, the panel held that the district court did not abuse its discretion in finding that there was some factual foundation for instructing the jury that section 2(a) required the wholesalers to show, as part of their prima facie case, that Living Essentials made "reasonably contemporaneous" sales to them and to Costco at different prices.

The panel further held that the district court did not abuse its discretion in instructing the jury that the wholesalers had to prove that any difference in prices could not be justified as "functional discounts" to compensate Costco for marketing or promotional functions. The panel concluded that the functional discount doctrine was legally available to defendants regardless of whether the wholesalers and Living Essentials were at the same level in the distribution chain,

and that there was some foundation in the evidence to support the jury instruction.

Part III, authored by Judge Ikuta

Section 2(d) of the Robinson-Patman Act provides that it is unlawful for a seller to pay anything of value to or for the benefit of a customer in connection with the sale of a product unless the payment is available on proportionally equal terms to all other customers competing in the distribution of this product. As to whether Costco and the wholesalers were in competition, it was undisputed that they both were customers of Living Essentials and purchased goods of the same grade and quality. The panel held that the district court did not clearly err in finding that the wholesalers' businesses were in geographic proximity to the Costco outlets that sold 5-hour Energy. The district court, however, committed both legal and factual errors in finding that Costco and the wholesalers operated at different functional levels and therefore competed for different customers of 5-hour Energy. The district court erred as a matter of law in concluding that when the jury found in favor of Living Essentials on the section 2(a) claim, it made an implicit factual finding that there was no competition between Costco and the wholesalers. And the record did not support the district court's finding that Costco and the wholesalers operated at different functional levels.

The panel vacated the district court's holding as to section 2(d) and reversed and remanded for the district court to consider whether Costco and the wholesalers purchased 5-hour Energy from Living Essentials within approximately the same period of time in light of the record, or whether the wholesalers otherwise proved competition.

Concurring in part and dissenting part, Judge Gilman wrote that he agreed with the majority that the district court did not abuse its discretion in giving the "functional discount" jury instruction, but he would reverse and remand for a new trial on the section 2(a) claim because the district court abused its discretion in giving the "reasonably contemporaneous" instruction.  As to the section 2(d) claim, Judge Gilman agreed with the majority that the district court abused its discretion in finding that Costco and the wholesalers operated at different functional levels.

Dissenting in part, Judge Miller wrote that he would affirm the judgment in its entirety because he agreed that the district court did not abuse its discretion in instructing the jury on the section 2(a) claims, but he did not agree that the district court erred in rejecting the section 2(d) claims.

## COUNSEL

Mark Poe (argued), Randolph Gaw, and Victor Meng, Gaw Poe LLP, San Francisco, California; Thomas C. Goldstein and Erica O. Evans, Goldstein & Russell PC, Bethesda, Maryland; Eric F. Citron, Gupta Wessler PLLC, Washington, D.C.; for Plaintiffs-Appellants.

David C. Frederick (argued), Daniel G. Bird, and Collin R. White, Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C.; E. Powell Miller and Martha J. Olijnyk, The Miller Law Firm PC, Rochester, Michigan; Gerald E. Hawxhurst, Hawxhurst Harris LLP, Los Angeles, California; for Defendants-Appellees.

**ORDER**

The Opinion filed on July 20, 2023, and published at 74 F.4th 960 (9th Cir. 2023), is amended by the opinion filed concurrently with this order. Further petitions for rehearing or rehearing en banc will not be allowed.

The panel has unanimously voted to deny appellants' petition for rehearing. Judge Ikuta and Judge Miller have voted to deny the petition for rehearing en banc, and Judge Gilman so recommends. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellants' petition for rehearing or rehearing en banc is DENIED.

The majority of the panel has voted to deny appellees' petition for rehearing. Judge Miller would grant the petition for rehearing. Judge Ikuta and Judge Miller have voted to deny the petition for rehearing en banc, and Judge Gilman so recommends. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellees' petition for rehearing and rehearing en banc is DENIED.

## OPINION

MILLER, Circuit Judge, as to Parts I and II:

This appeal arises out of an action under the Robinson-Patman Price Discrimination Act, 15 U.S.C. §§ 13–13b, 21a. The jury returned a verdict for the defendants, and the district court denied the plaintiffs' requested injunctive relief. The plaintiffs challenge various jury instructions as well as the denial of injunctive relief. We affirm in part and vacate, reverse, and remand in part.

I

Living Essentials, LLC, produces 5-hour Energy, a caffeinated drink sold in 1.93-ounce bottles. Living Essentials sells 5-hour Energy to various purchasers, including wholesalers, retailers, and individual consumers.

This case concerns Living Essentials' sales of 5-hour Energy to two sets of purchasers. One purchaser is the Costco Wholesale Corporation, which purchases 5-hour Energy for resale at its Costco Business Centers—stores geared toward "Costco business members," such as restaurants, small businesses, and other retailers, but open to any person with a Costco membership. The other purchasers, whom we will refer to as "the Wholesalers," are seven California wholesale businesses that buy 5-hour Energy for resale to convenience stores and grocery stores, among other retailers. The Wholesalers allege that Living Essentials has offered them less favorable pricing, discounts, and reimbursements than it has offered Costco.

During the time period at issue here, Living Essentials charged the Wholesalers a list price of $1.45 per bottle of "regular" and $1.60 per bottle of "extra-strength" 5-hour

Energy, while Costco paid a list price of ten cents per bottle less: $1.35 and $1.50, respectively. Living Essentials also provided the Wholesalers and Costco with varying rebates, allowances, and discounts affecting the net price of each bottle. For example, the Wholesalers received a 7-cent per bottle "everyday discount," a 2 percent discount for prompt payment, and discounts for bottles sold from 5-hour Energy display racks. Meanwhile, Costco received a 1 percent prompt-pay discount; a spoilage discount to cover returned, damaged, and stolen goods; a 2 percent rebate on total sales for each year from 2015 to 2018; payments for displaying 5-hour Energy at the highly visible endcaps of aisles and fences of the store; and various advertising payments.

Living Essentials also participated in Costco's Instant Rebate Coupon (IRC) program. Under that program, Costco sent monthly mailers to its members with redeemable coupons for various products. About every other month, Costco would offer its members an IRC worth $3.60 to $7.20 per 24-pack of 5-hour Energy—a price reduction of 15 to 30 cents per bottle. The customer would redeem the IRC from Costco at the register when buying the 24-pack, and Living Essentials would reimburse Costco for the face value of the 5-hour Energy IRCs redeemed that month. Over the course of the seven-year period at issue here, Living Essentials reimbursed Costco for about $3 million in redeemed IRCs.

In February 2018, the Wholesalers brought this action against Living Essentials and its parent company, Innovation Ventures, LLC, in the Central District of California, alleging that by offering more favorable prices, discounts, and reimbursements to Costco, Living Essentials had violated the Robinson-Patman Act, which prohibits sellers of goods from discriminating among competing buyers in certain

circumstances. The Wholesalers sought damages under section 2(a) of the Act and an injunction under section 2(d).

Section 2(a)—referred to as such because of its original place in the Clayton Act, *see Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175 (2006)—bars a seller from discriminating in price between competing purchasers of commodities of like grade and quality. 15 U.S.C. § 13(a). One form of prohibited discrimination under section 2(a) is secondary-line price discrimination, "which means a seller gives one purchaser a more favorable price than another." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1187 (9th Cir. 2016). To establish secondary-line discrimination, a plaintiff must show that (1) the challenged sales were made in interstate commerce; (2) the items sold were of like grade and quality; (3) the seller discriminated in price between the disfavored and the favored buyer; and (4) "'the effect of such discrimination may be . . . to injure, destroy, or prevent competition' to the advantage of a favored purchaser." *Volvo*, 546 U.S. at 176–77 (quoting 15 U.S.C. § 13(a)). The fourth component of that test, the element at issue in this case, ensures that section 2(a) "does not ban all price differences," but rather "proscribes 'price discrimination only to the extent that it threatens to injure competition.'" *Id.* at 176 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993)).

Section 2(d) makes it unlawful for a manufacturer to discriminate in favor of one purchaser by making "payment[s]" to that purchaser "in connection with the . . . sale, or offering for sale of any products . . . unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products." 15 U.S.C. § 13(d). To prevail

on a claim for injunctive relief under section 2(d), the plaintiff must establish that it is in competition with the favored buyer, and "must show a threat of antitrust injury," *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122 (1986), but it need not make "a showing that the illicit practice has had an injurious or destructive effect on competition." *FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 65 (1959).

On summary judgment, the district court found that the Wholesalers had proved the first three elements of their section 2(a) claim—that the products were distributed in interstate commerce, of like grade and quality, and sold at different prices to Costco and to the Wholesalers. The parties proceeded to try to a jury the fourth element of section 2(a), whether there was a competitive injury, and to try to the court the section 2(d) claim for injunctive relief.

At trial, the parties focused on whether the Wholesalers and Costco were in competition. The Wholesalers introduced numerous emails from Living Essentials employees discussing the impact of Costco's pricing on the Wholesalers' sales. Additionally, they presented the testimony of a marketing expert who opined that the Wholesalers and the Costco Business Centers were in competition. The expert based that opinion on the companies' geographic proximity and on interviews he conducted in which the Wholesalers' proprietors stated that they lost sales due to Costco's lower prices. Living Essentials primarily relied on the testimony of an expert who reviewed sales data and opined that buyers of 5-hour Energy are not price sensitive and do not treat the Wholesalers and Costco Business Centers as substitutes; for that reason, he concluded that the Wholesalers and Costco Business Centers were not competitors.

The district court instructed the jury that section 2(a) required the Wholesalers to show that Living Essentials made "reasonably contemporaneous" sales to them and to Costco at different prices. The Wholesalers objected. They agreed that the instruction correctly stated the law but argued that "[t]here is literally no evidence to suggest that Living Essentials' sales of 5-Hour Energy to Costco and Plaintiffs occurred at anything other than the same time over the entire 7-year period." The court nevertheless gave the proposed instruction, telling the jury that "[e]ach Plaintiff must prove that the sales being compared were reasonably contemporaneous." The instruction directed the jury to find for Living Essentials if it determined "that the sales compared are sufficiently isolated in time or circumstances that they cannot be said to have occurred at approximately the same time for a Plaintiff." The instruction also listed a number of factors for the jury to consider in its evaluation, such as "[w]hether market conditions changed during the time between the sales."

The district court further instructed the jury that the Wholesalers had to prove that any difference in prices could not be justified as "functional discounts" to compensate Costco for marketing or promotional functions that it performed. The Wholesalers again objected. As with the instruction on reasonably contemporaneous sales, the Wholesalers agreed that the instruction was a correct statement of the law, but they argued that there was "a complete absence of evidence" of any savings for Living Essentials or costs for Costco in performing the alleged functions justifying the discount. Rejecting that argument, the court instructed the jury that Living Essentials claimed that "its lower prices to Costco are justified as functional discounts," which the court defined as discounts "given by a

seller to a buyer based on the buyer's performance of certain functions for the seller's product." The instructions explained that while the Wholesalers had "the ultimate burden to prove that defendant's lower prices were not justified as a functional discount," Living Essentials had the burden of production and so "must present proof" that "(1) Costco actually performed the promotional, marketing, and advertising services" it claimed to perform and "(2) the amount of the discount was a reasonable reimbursement for the actual functions performed by Costco." The instructions told the jury to find for Living Essentials if it found that the price discrimination was "justified as a functional discount."

The jury returned a verdict for Living Essentials on the section 2(a) claim. The court then denied the Wholesalers' request for injunctive relief under section 2(d). The court reasoned that "the jury implicitly found no competition existed between [the Wholesalers] and Costco, and the Court is bound by that finding." In addition, the court concluded, based on its own independent review of the evidence, that the Wholesalers had "failed to prove by a preponderance of the evidence that they competed with Costco for resale" of 5-hour Energy.

## II

We begin by considering the jury instructions on reasonably contemporaneous sales and functional discounts. Our standard of review of a district court's decision to give a jury instruction depends on the error that is alleged. *Yan Fang Du v. Allstate Ins. Co.*, 697 F.3d 753, 757 (9th Cir. 2012). We review legal issues de novo, including "[w]hether a district court's jury instructions accurately state the law." *Coston v. Nangalama*, 13 F.4th 729, 732 (9th Cir. 2021) (quoting *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1085

(9th Cir. 2017)). Here, however, the Wholesalers do not argue that the challenged instructions misstated the law. Instead, they argue that the evidence did not support giving them. "Whether there is sufficient evidence to support an instruction is reviewed for abuse of discretion." *Yan Fang Du*, 697 F.3d at 757. In conducting that review, we give "considerable deference" to the district court because we recognize the "district judge's proximity to the trial and intimate knowledge of the record." *United States v. Heredia*, 483 F.3d 913, 921 (9th Cir. 2007) (en banc).

Sufficient evidence necessarily requires *some* evidence, and it has long been "settled law that it is error in the court to give an instruction when there is no evidence in the case to support the theory of fact which it assumes." *Tweed's Case*, 16 Wall. (83 U.S.) 504, 518 (1872); *see Avila v. Los Angeles Police Dep't*, 758 F.3d 1096, 1101 (9th Cir. 2014). But sufficient evidence does not require convincing evidence, or even strong evidence; rather, "a party is entitled to have his theory of the case presented to the jury by proper instructions, if there be *any* evidence to support it." *Blassingill v. Waterman S.S. Corp.*, 336 F.2d 367, 368 (9th Cir. 1964) (emphasis added) (internal quotation marks and footnote omitted). "The district court could not have abused its discretion unless there was no factual foundation to support . . . an instruction." *Desrosiers v. Flight Int'l of Fla. Inc.*, 156 F.3d 952, 959 (9th Cir. 1998).

The question before us is whether the district court abused its wide discretion in finding that there was any foundation for giving the instructions. We conclude that it did not.

A

The Wholesalers argue that the district court abused its discretion in instructing the jury on reasonably contemporaneous sales because "there was no legitimate dispute" that the Wholesalers carried their burden on that requirement.

To establish a prima facie case under section 2(a), a plaintiff must show that the discriminating seller made one sale to the disfavored purchaser and one sale to the favored purchaser "within approximately the same period of time." *Texas Gulf Sulphur Co. v. J.R. Simplot Co.*, 418 F.2d 793, 807 (9th Cir. 1969) (quoting *Tri-Valley Packing Ass'n v. FTC*, 329 F.2d 694, 709 (9th Cir. 1964)). In other words, it must establish "[t]wo or more contemporaneous sales by the same seller." *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 677 (9th Cir. 1975). That requirement ensures that the challenged price discrimination is not the result of a seller's lawful response to a change in economic conditions between the sales to the favored and disfavored purchasers. *Texas Gulf Sulphur Co.*, 418 F.2d at 806.

As we have explained, the Wholesalers do not argue that the district court's instructions on reasonably contemporaneous sales misstated the law. Instead, they contend that they so clearly carried their burden on this element that the district court should have found the element satisfied rather than asking the jury to decide it. In the Wholesalers' view, "there was no dispute . . . that [Living Essentials] had made *thousands* of contemporaneous sales to Costco and to all seven Plaintiffs."

The Wholesalers' position appears to be that when the plaintiff has the burden of proving an element of its case, a district court should decline to instruct the jury on that

element if the court determines the plaintiff has proved it too convincingly. We are unaware of any authority for that proposition. To the contrary, our cases that have rejected proposed jury instructions have done so because the party bearing the burden presented too little evidence to justify the instruction, not too much. *See, e.g.*, *Avila*, 758 F.3d at 1101 (affirming the denial of an instruction on a defense for which the defendant lacked evidence); *Yan Fang Du*, 697 F.3d at 758 (affirming the denial of an instruction on a theory of liability for which the plaintiff lacked evidence). If the Wholesalers believed that their evidence conclusively established liability, the appropriate course of action would have been to move for judgment as a matter of law. *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 396 (2006). But although the Wholesalers did move for judgment as a matter of law, they have not challenged the denial of that motion on appeal. The Wholesalers may not bypass that procedure by challenging a jury instruction on an element of their prima facie case.

Even if it could be error to instruct the jury on an element that a plaintiff obviously proved, the proof here was far from obvious. The Wholesalers might be right that the evidence established reasonably contemporaneous sales, but during the trial, they did not explain how it did so. In their written objection to the instructions, the Wholesalers stated that "[t]here is literally no evidence to suggest" that the compared sales were not contemporaneous, and in their oral objection, they similarly declared that there was "no dispute" on the issue. The first and last time the Wholesalers mentioned the requirement to the jury was during closing argument, when they said that the "[t]he sales were made continuously to Costco and to plaintiffs over the entire seven years." Despite those confident assertions, the Wholesalers

did not direct the district court to any evidence to substantiate their claim.

The Wholesalers did not point to any evidence of reasonably contemporaneous sales until their post-trial motion for judgment as a matter of law. Because that motion was not available to the district court when the court instructed the jury, it cannot be a basis for concluding that the court abused its discretion. In any event, the motion did not clearly identify any reasonably contemporaneous sales. Instead, the Wholesalers merely referred to Exhibit 847, a series of spreadsheets introduced by Living Essentials that spans more than 100,000 cells cataloguing seven years' worth of Living Essentials' sales to all purchasers, including Costco and the Wholesalers. The motion presented a modified version of that exhibit that included only Living Essentials' sales to Costco and the Wholesalers, omitting sales to other purchasers. But that (relatively) pared-down version—itself more than 200 pages long—was never presented to the jury. Even that version is hardly self-explanatory, and the Wholesalers made little effort to explain it: They did not point to any specific pair of sales that were reasonably contemporaneous.

Indeed, even on appeal, the Wholesalers have not identified any pair of sales that would satisfy their burden. The most they have argued is that the column entitled "Document Date" reflects the date of the invoice, so in their view the spreadsheets speak for themselves in showing "thousands of spot sales to Costco and Plaintiffs." At no time have the Wholesalers shown that there were two or more sales between Living Essentials and both Costco and *each* plaintiff that were reasonably contemporaneous such that changing market conditions or other factors did not affect the

pricing. *See Rutledge*, 511 F.2d at 677; *Texas Gulf Sulphur Co.*, 418 F.2d at 806.

The Wholesalers complain that they are being unfairly faulted for not more thoroughly arguing "the incorrectly instructed point to the jury." That complaint reflects a misunderstanding of their burden. To take the issue away from the jury, it was the Wholesalers' burden to make—and support—the argument that the sales were reasonably contemporaneous. Perhaps, when it developed the jury instructions, the district court could have reviewed all of the evidence, located Exhibit 847 (the full version, not the more focused one the Wholesalers submitted later), and then identified paired transactions for each Wholesaler from the thousands upon thousands of cells it contained. But "a district court is not required to comb the record" to make a party's argument for it. *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pacific Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). There may have been a needle—or even many needles—in the haystack of sales data. It was not the district court's job to hunt for them.

Significantly, the district court identified factors that might have influenced the pricing between sales, including that "the overall sales of 5-hour Energy in California were declining." That trend could potentially explain why two differently priced sales resulted from "diverse market conditions rather than from an intent to discriminate." *Texas Gulf Sulphur Co.*, 418 F.2d at 806. The timing of the disputed sales is unclear, so it could be that the Wholesalers bought the product during periods of higher market pricing that Costco avoided. The possibility that sales were not reasonably contemporaneous has "some foundation in the evidence," and that is enough. *Jenkins v. Union Pac. R.R.*

*Co.*, 22 F.3d 206, 210 (9th Cir. 1994). With only the Wholesalers' conclusory assertions, an unexplained mass of spreadsheets, and Living Essentials' evidence of changing market conditions before it, the district court did not abuse its discretion in instructing the jury on this disputed element of the Wholesalers' prima facie case.

## B

The Wholesalers next argue that the district court abused its discretion in giving the functional-discount instruction.

The Supreme Court has held that when a purchaser performs a service for a supplier, the supplier may lawfully provide that purchaser with a "reasonable" reimbursement, or a "functional discount," to compensate the purchaser for "its role in the supplier's distributive system, reflecting, at least in a generalized sense, the services performed by the purchaser for the supplier." *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 562, 571 n.11 (1990). For example, the Court has held that a "discount that constitutes a reasonable reimbursement for the purchasers' actual marketing functions will not violate the Act." *Id.* at 571.

Separately, the Robinson-Patman Act contains a statutory affirmative defense for cost-justified price differences, or "differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery." 15 U.S.C. § 13(a). The functional-discount doctrine is different because it requires only a "reasonable," not an exact, relationship between the services performed and the discounts given. *Hasbrouck*, 496 U.S. at 561 & n.18. Also, in contrast to the cost-justification defense, it is the plaintiff's burden to prove that the price discrimination was not the result of a lawful functional discount. *Id.* at 561 n.18. But the doctrine applies "[o]nly to the extent that a buyer

*actually* performs certain functions, assuming all the risk, investment, and costs involved." *Id.* at 560–61. And it does not "countenance a functional discount completely untethered to either the supplier's savings or the wholesaler's costs" *Id.* at 563.

The Wholesalers do not dispute that the jury instructions accurately stated the law governing functional discounts. Instead, they argue that the district court should not have given a functional-discount instruction because the doctrine does not apply "as *between* favored and disfavored wholesalers" and because the discounts given to Costco bore no relationship to Living Essentials' savings or Costco's costs in performing the alleged functions. We find neither argument persuasive.

The Wholesalers are correct that selective reimbursements may create liability for the supplier under section 2(d) if the supplier fails to offer them "on proportionally equal terms to all other" competing purchasers. 15 U.S.C. § 13(d). Nevertheless, purchasers at the same level of trade may receive different functional discounts if they perform different functions. A functional discount may compensate a purchaser for "assuming all the risk, investment, and costs involved" with "perform[ing] certain functions," *Hasbrouck*, 496 U.S. at 560–61, and "[e]*ither* because of this additional cost *or* because competing buyers do not function at the same level," James F. Rill, *Availability and Functional Discounts Justifying Discriminatory Pricing*, 53 Antitrust L.J. 929, 934 (1985) (emphasis added), a functional discount "negates the probability of competitive injury, an element of a prima facie case of violation," *Hasbrouck,* 496 U.S. at 561 n.18 (quoting Rill, *supra*, at 935). Conversely, even where customers do operate at different levels of trade, a discount may violate the

Robinson-Patman Act if it does not reflect the cost of performing an actual function. *See Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987) ("Where . . . the discount given to a customer higher in the distributive chain is sufficiently substantial and is unrelated to the costs of the customer's function, . . . . a plaintiff may assert a cause of action against the seller even though he and the favored customer operate at different market levels."), *aff'd*, 496 U.S. 543 (1990).

In all section 2(a) cases, a plaintiff "ha[s] the burden of proving . . . that the discrimination had a prohibited effect on competition." *Hasbrouck*, 496 U.S. at 556. To the extent that a "legitimate functional discount," *id.* at 561 n.18, compensates a buyer for "*actually* perform[ing] certain functions, assuming all the risk, investment, and costs involved," *id.* at 560 (citation omitted), no such effect can be shown.

Here, the competitive-injury element was the subject of dispute at trial. Because Living Essentials offered evidence that it compensated Costco for performing certain functions and assuming certain risks (which would eliminate a competitive injury), the Wholesalers had the burden of showing that those functions and risks did not justify the discounted price that Costco received—whether or not Costco and the Wholesalers were at the same level of trade.

The Wholesalers also argue that even if the functional-discount instruction was legally available to Living Essentials, the district court still abused its discretion in giving the instruction because there was no foundation in the evidence to support it. In fact, Living Essentials presented evidence that Costco performed several marketing and other functions that could have been compensated for by a

functional discount. For example, Costco promoted 5-hour Energy by giving the product prime placement in aisle endcaps and along the fence by the stores' entrances; it created and circulated advertisements and mailers; it provided delivery and online sales for 5-hour Energy; and it contracted for a flat "spoilage allowance" rather than requiring Living Essentials to deal with spoilage issues as they arose. In addition to providing those services, Costco allowed Living Essentials to participate in its IRC program, in which Costco sent out bi-monthly mailers with coupons for 5-hour Energy, among other products, to its members. The member would redeem the coupon at the register, and Costco would advance the discount to the buyer on behalf of Living Essentials, record the transaction, and then collect the total discount from Living Essentials at the end of each period.

Living Essentials testified that Costco received "allowance[s]" in relation to its placement services because Costco was "performing a service for us." As to Costco's advertising and IRC services, Living Essentials testified that they allowed it to reach some 40 million Costco members, whom it could not otherwise reach "with one payment." Finally, in the case of the spoilage discount, Living Essentials explained that by providing a flat, upfront discount in exchange for Costco's assumption of the risk of loss and spoilage, Living Essentials avoided having to negotiate case-by-case with Costco over product loss.

The Wholesalers argue that the functional discount defense is unavailable because Living Essentials separately compensated Costco for promotional, marketing, and advertising services, so "the entirety of the price-gap cannot be chalked up to a unitary 'functional discount.'" They cite spreadsheets showing that Costco was paid for endcap

promotions, advertising, and IRCs. But those spreadsheets do not show that Living Essentials' separate payments to Costco fully compensated it for those services. They therefore do not foreclose the possibility that some additional discount might have reflected reasonable compensation for the services.

More generally, the Wholesalers argue that even if Costco's services were valuable, "Living Essentials introduced zero evidence that its lower prices to Costco bore any relationship to either" Living Essentials' savings or Costco's costs. In fact, there is evidence in the record from which it is possible to infer such a relationship. For instance, Living Essentials presented testimony that Costco's performance of advertising functions—especially the 40-million-member mailers as well as endcap and fence placement programs—gave it "a tremendous amount of reach and awareness," which Living Essentials would otherwise have had to purchase separately. The record thus supported the conclusion that Living Essentials provided Costco "a functional discount that constitutes a reasonable reimbursement for [its] actual marketing functions." *Hasbrouck*, 496 U.S. at 571.

To be sure, the evidence did not establish a particularly precise relationship between the discounts and Costco's services, and it was open to the Wholesalers to argue that the discounts were so "untethered to either the supplier's savings or the wholesaler's costs" as not to qualify as functional discounts. *Hasbrouck*, 496 U.S. at 563. But it was the jury's role, not ours, to decide which party had the better interpretation of the evidence. The only question before us is whether the district court abused its discretion in determining that there was enough evidence to justify giving an instruction on functional discounts. Because at least some

evidence supported the instruction, we conclude that there was no abuse of discretion.

The Wholesalers separately argue that the district court erred in denying their pre-verdict motion for judgment as a matter of law to exclude the functional-discount defense. Because the Wholesalers did not renew that argument in their post-verdict motion under Federal Rule of Civil Procedure 50(b), they failed to preserve the issue for appeal. *See Crowley v. Epicept Corp.*, 883 F.3d 739, 751 (9th Cir. 2018) (per curiam).

## III

Finally, the Wholesalers challenge the district court's denial of injunctive relief under section 2(d). We review the district court's legal conclusions de novo and its factual findings under the clear-error standard. *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019). We review the denial of a permanent injunction under the abuse-of-discretion standard. *Or. Coast Scenic R.R.*, *LLC v. Or. Dep't of State Lands*, 841 F.3d 1069, 1072 (9th Cir. 2016).

## A

Under section 2(d), it is unlawful for a seller to pay "anything of value to or for the benefit of a customer" for "any services or facilities furnished by or through such customer in connection with the . . . sale" of the products unless the payment "is available on proportionally equal terms to all other customers competing in the distribution of such products."    15 U.S.C. § 13(d); *Tri-Valley Packing Ass'n*, 329 F.2d at 707–08.    In enacting the Robinson-Patman Act, "Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of

large chainstores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand." *Volvo*, 546 U.S. at 175 (citing 14 HERBERT HOVENKAMP, Antitrust Law ¶ 2302 (2d ed. 2006)). In other words, Congress meant to prevent an economically powerful customer like a chain store from extracting a better deal from a seller at the expense of smaller businesses.[1]

The key issue in this case is whether Costco and the Wholesalers (both customers of Living Essentials) are "customers competing" with each other as to resales of 5-hour Energy for purposes of section 2(d). The FTC has interpreted the statutory language in section 2(d) to mean that customers are in competition with each other when they "compete in the resale of the seller's products of like grade and quality at the same functional level of distribution." 16 C.F.R. § 240.5.[2]

Our interpretation of "customers competing," as used in 15 U.S.C. § 13(d), is consistent with the FTC's. We have held that, to establish that "two customers are in general competition," it is "sufficient" to prove that: (1) one customer has outlets in "geographical proximity" to those of the other; (2) the two customers "purchased goods of the same grade and quality from the seller within approximately the same period of time"; and (3) the two customers are

---

[1] To avoid confusion, we refer to the seller or supplier of a product as the "seller," the seller's customers as "customers," and those who buy from the seller's customers as "buyers."

[2] Although the FTC Guides that "provide assistance to businesses seeking to comply with sections 2(d) and 2(e)," 16 C.F.R. § 240.1, do not have the force of law, "we approach the [Guides] with the deference due the agency charged with day-to-day administration of the Act," *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 355 (1968).

operating "on a particular functional level such as wholesaling or retailing." *Tri-Valley Packing Ass'n*, 329 F.2d at 708.   Under these circumstances, "[a]ctual competition in the sale of the seller's goods may then be inferred." *Id.*; *see also Infusion Res., Inc. v. Minimed, Inc.*, 351 F.3d 688, 692–93 (5th Cir. 2003) (holding that "[t]he competitive nexus is established if the disfavored purchaser and favored purchaser compete at the same functional level and within the same geographic market at the time of the price discrimination," which indicates that each customer is "directly after the same dollar") (citing *M.C. Mfg. Co. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1065 (5th Cir. 1975) (internal quotation marks omitted)).   We reasoned that this interpretation was consistent with "the underlying purpose of section 2(d)," which is to "require sellers to deal fairly with their customers who are in competition with each other, by refraining from making allowances to one such customer unless making it available on proportionally equal terms to the others."   *Tri-Valley Packing Ass'n*, 329 F.2d at 708. Because sellers, in order to avoid violating section 2(d), must "assume that all of their direct customers who are in functional competition in the same geographical area, and who buy the seller's products of like grade and quality within approximately the same period of time, are in actual competition with each other in the distribution of these products," courts must make the same assumption of competition "in determining whether there has been a violation." *Id.* at 709.[3] Applying this rule, *Tri-Valley* held

---

[3] The "direct customer" requirement in *Tri-Valley* no longer remains good law after *Fred Meyer*, in which the Supreme Court held that a seller's duty to provide proportionately equal promotional services or facilities, or payment thereof, extends downstream to buyers competing

that two wholesalers that received canned goods from the same supplier and sold them in the same geographical area would be in "actual competition" if the wholesalers had purchased the canned goods at approximately the same time. If this final criterion were met, then "a section 2(d) violation would be established" because the canned-good supplier gave one wholesaler a promotional allowance, but did not offer the same allowance to the other wholesaler. *Id.*

In considering the third prong of the *Tri-Valley* test— whether the two customers are operating "on a particular functional level such as wholesaling or retailing," *id*. at 708—we ask whether customers are actually functioning as wholesalers or retailers with respect to resales of a particular product to buyers, regardless of how they describe themselves or their activities. *See Alterman Foods, Inc. v. FTC*, 497 F.2d 993, 999 (5th Cir. 1974) (upholding the FTC's determination that two customers were "functional competitor[s]" on the wholesale level based on market realities); *see also Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 214 (3d Cir. 2007) ("[T]he relevant question is whether two companies are in 'economic reality acting on the same distribution level,' rather than whether they are both labeled as 'wholesalers' or 'retailers.'") (citation omitted).

In listing the factors to consider in determining whether customers are competing, *Tri-Valley* did not include the manner in which customers operate. It makes sense that operational differences are not significant in making this

---

with each other at the same functional level, even if one set of buyers purchases directly from the defendant while another set purchases through intermediaries. *See* 390 U.S. at 352–53; *see also Tri Valley Growers v. FTC*, 411 F.2d 985, 986 (9th Cir. 1969) (per curiam).

determination, given that the Robinson-Patman Act was enacted to protect small businesses from the harm to competition caused by the large chain stores, notwithstanding the well-understood operational differences between the two. *See, e.g.*, *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 160 (2d Cir. 2004) (explaining that chain stores have a more integrated distribution apparatus than smaller businesses and are able to "undersell their more traditional competitors"). Thus, courts have indicated that potential operational differences are not relevant to determining whether two customers compete for resales to the same group of buyers. In *Simplicity Pattern Co.*, the Supreme Court held that competition in the sale of dress patterns existed between variety stores that "handle and sell a multitude of relatively low-priced articles," and the more specialized fabric stores, which "are primarily interested in selling yard goods" and handled "patterns at no profit or even at a loss as an accommodation to their fabric customers and for the purpose of stimulating fabric sales." 360 U.S. at 59–60. The Court noted that the manner in which these businesses offered the merchandise to buyers was different, because the variety stores "devote the minimum amount of display space consistent with adequate merchandising—consisting usually of nothing more than a place on the counter for the catalogues, with the patterns themselves stored underneath the counter," while "the fabric stores usually provide tables and chairs where the customers may peruse the catalogues in comfort and at their leisure." *Id*. at 60. Nevertheless, the Court held there was no question that there was "actual competition between the variety stores and fabric stores," given that they were selling an "identical product [patterns] to substantially the same segment of the public." *Id.* at 62.

Similarly, in *Feesers*, the "different character" of two businesses that bought egg and potato products from a food supplier did not affect the analysis of whether they were in actual competition.  498 F.3d at 214 n.9.  Although the businesses operated and interacted with their clients in different ways—one was a "full line distributor of food and food related products" while the other was a "food service management company"—the court held that "[t]he threshold question is whether a reasonable factfinder could conclude [the two customers] directly compete for resales [of the food supplier's] products among the same group of [buyers]." *Id*.; *see also Lewis v. Philip Morris Inc*., 355 F.3d 515, 531–32 (6th Cir. 2004) (noting that there was a genuine dispute of material fact as to whether companies that use vending machines to resell cigarettes were in actual competition with convenience stores for the resale of cigarettes to smokers under the Robinson-Patman Act).

An assumption underlying the *Tri-Valley* framework is that two customers in the same geographic area are competing for resales to the same buyer or group of buyers. However, the Supreme Court has identified an unusual circumstance when that assumption does not hold true and customers who resell the same product at the same functional level in the same geographic area are not in competition because they are not reselling to the same buyer. *See Volvo*, 546 U.S. at 175; *see also* 14 PHILLIP E. AREEDA & HERBERT HOVENKAMP, Antitrust Law ¶ 2333 (4th ed. 2019) (noting that the holding in *Volvo* regarding the same buyer is "quite narrow," and would "appear not to apply in the typical 'chain store' situation where dealers [] actually purchase and carry substantial inventories" for sale to all comers).

In *Volvo*, Volvo dealers (customers of Volvo, the car manufacturer and seller) resold trucks through a competitive bidding process, where retail buyers described their specific product requirements and invited bids from selected dealers of different manufacturers.  546 U.S. at 170.  Only after a Volvo dealer was invited to bid did it request discounts or concessions from Volvo as part of preparing the bid.  *Id.* Volvo dealers typically did not compete with each other in this situation.[4]  Because the plaintiff in *Volvo* (a Volvo dealer) could not show that it and another Volvo dealer were invited by the same buyer to submit bids, there was no competition between Volvo dealers, and therefore no section 2(a) violation (which requires competition and potential competitive injury).  *Id.*  Moreover, because the plaintiff did not ask for price concessions from Volvo until after the buyer invited it to bid, *id.*, (and no other Volvo dealer had been invited to bid, *id.* at 172) there could be no section 2(a) violation, *id.* at 177.  Recognizing that the fact pattern in *Volvo* was different from a traditional Robinson-Patman Act "chainstore paradigm" case, where large chain stores were competing with small businesses for buyers, *id.* at 178, the Court "declin[ed] to extend Robinson-Patman's governance" to cases with facts like those in *Volvo*, *id.* at 181; *see also Feesers*, 498 F.3d at 214 (suggesting that there may be no actual competition where customers are selling to "two separate and discrete groups" of buyers).

---

[4] In the rare occasions when the same buyer solicited a bid from more than one Volvo dealer, Volvo's policy was "to provide the same price concession to each dealer competing head-to-head for the same sale." *Id.* at 171.

B

We now turn to the question whether Costco and the Wholesalers were in actual competition.

It is undisputed that Costco and the Wholesalers were customers of Living Essentials and purchased goods of the same grade and quality. Further, the district court found that the Wholesalers' businesses were in geographic proximity to the Costco Business Centers, the only outlets that sold 5-hour Energy. It held that there "was at least one Costco Business Center in close proximity to each of the [Wholesalers] or their customers." Living Essentials and Judge Miller's dissent seemingly argue that this finding is clearly erroneous, because the maps in the record are ambiguous and the Wholesalers' expert, Dr. Frazier, is unreliable, because he "did not calculate the distance or drive time[s] between the stores" and did not conduct customer surveys. We disagree. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). Therefore, we defer to the district court's fact-finding notwithstanding the alleged ambiguity in the evidence. Further, the district court could reasonably reject Living Essentials' critique of Dr. Frazier's methodology.

We next consider whether Costco and the Wholesalers operated at different functional levels with respect to resales of 5-hour Energy. The district court found that they did operate at different functional levels, and therefore competed for different customers of 5-hour Energy. In so holding, the

district court abused its discretion because its ruling was based on both legal and factual errors.[5]

First, the district court erred as a matter of law in concluding that, because the jury found in favor of Living Essentials on the section 2(a) claim, the jury made an implicit factual finding that there was no competition between Costco and the Wholesalers. As we have explained, to prevail on a section 2(a) claim, the Wholesalers had to show that the Wholesalers and Costco were in competition with each other, and that discriminatory price concessions or discounts caused a potential injury to competition. Therefore, in rejecting the Wholesalers' claim, the jury could have determined that the Wholesalers and Costco were competing, but there was no potential harm to competition. Because the jury did not necessarily find that the Wholesalers and Costco were not competing, the district court erred by holding that the jury had made an implicit finding of no competition.[6]

---

[5] The Wholesalers do not challenge the district court's holding that they are judicially estopped from seeking an injunction on the ground that the IRCs are promotional services in connection with resale under section 2(d). Therefore, any challenge to this finding is waived, and potential injunctive relief under section 2(d) excludes relief related to IRCs. *See Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 979 F.2d 721, 726 (9th Cir. 1992).

[6] Contrary to Living Essentials' assertion, the Wholesalers did not waive this argument. Although a party that agrees to the use of a general verdict form waives a future challenge to the verdict as insufficiently specific, *see, e.g.*, *McCord v. Maguire*, 873 F.2d 1271, 1274 (9th Cir.), *opinion amended on other grounds on denial of reh'g*, 885 F.2d 650 (9th Cir. 1989), the Wholesalers do not raise such a challenge. Rather, the Wholesalers argue that the district court made a legal error in interpreting the verdict, and that argument is not waived.

Second, the district court erred in holding that Costco and the Wholesalers did not operate at the same functional level.  The district court stated that Costco was a retailer and made the vast majority of its sales to the ultimate consumer.  This finding is unsupported by the record, which contains no evidence that Costco sold 5-hour Energy to consumers.  Rather, the evidence supports the conclusion that Costco sold 5-hour Energy to retailers.  First, Living Essentials' Vice President of Sales, Scott Allen, testified that from 2013 to 2016, only Costco Business Centers, which target retailers, and not regular Costco stores, which target consumers, carried 5-hour Energy.  Another Living Essentials employee, Larry Fell, testified that 90 percent of all Costco Business Center clients were businesses, and that Costco Business Centers targeted mom-and-pop convenience stores and small grocery stores.  Allen also testified that Costco Business Centers sold 5-hour Energy in 24-packs, which Living Essentials packages for sale to businesses rather than to consumers.  This evidence supports the conclusion that Costco sold 24-packs of 5-hour Energy to retailers, and there is no evidence supporting the district court's conclusion that Costco sold 5-hour Energy to consumers.  Therefore, as a matter of "economic reality," both Costco and the Wholesalers were wholesalers of 5-hour Energy.  The district court clearly erred by holding otherwise.

Because the evidence shows that Costco and the Wholesalers operated at the same functional level in the same geographic area, if the Wholesalers and Costco purchased 5-hour Energy within approximately the same period of time, this confluence of facts is sufficient to establish that Costco and the Wholesalers are in actual

competition with each other in the distribution of 5-hour Energy.  *See Tri-Valley Packing Ass'n*, 329 F.2d at 708.

## C

Judge Miller's dissent argues that Costco and the Wholesalers are not in actual competition because they did not compete in the resales of 5-hour Energy to the same buyers.  The dissent bases this argument on evidence in the record that Costco and the Wholesalers had "substantial differences in operations" and that buyers did not treat Costco and the Wholesalers as substitute supply sources of 5-hour Energy.  We disagree with both arguments.

First, the differences in operations that Judge Miller's dissent cites, such as differences in the availability of in-store credit, negotiated prices, or different retail-oriented accessories such as 5-hour Energy display racks, are not relevant to determining whether Costco and the Wholesalers are "customers competing" under 15 U.S.C. § 13(d).  As explained above, customers may compete for purposes of section 2(d) even if they operate in different manners.  *Cf. Simplicity Pattern Co.*, 360 U.S. at 59–62 (holding that a variety store and a specialized fabric store were in competition for the sale of clothing patterns even though they carried different inventories and presented the merchandise in different manners).  Our sister circuits have taken a similar approach.  *See Feesers*, 498 F.3d at 214 n.9 (holding that, for purposes of determining whether two businesses were in competition, it was irrelevant that one was "a full line distributor of food and food related products" and the other was a "food service management company," with very different operations); *see also Lewis*, 355 F.3d at 531–32 (holding that companies using vending machines to resell cigarettes can be in competition with convenience

stores that resell cigarettes); *Innomed Labs*, 368 F.3d at 160 (holding that chain stores in competition with smaller businesses often offer lower prices than smaller businesses).

In addition to precedent, FTC guidance indicates that customers are in competition with each other when they "compete in the resale of the seller's products of like grade and quality at the same functional level of distribution," regardless of the manner of operation.  16 C.F.R. § 240.5. For example, a discount department store may be competing with a grocery store for distribution of laundry detergent. *See id.* (Example 3).

Second, Judge Miller's dissent argues that Costco and the Wholesalers may not be in actual competition because it is not clear they sold to the same buyers.  In making this argument, the dissent and Living Essentials primarily rely on Living Essentials' economic expert, Dr. Darrel Williams, who testified that Costco and the Wholesalers were not in competition because their buyers did not treat Costco and the Wholesalers as substitute supply sources.  Dr. Williams based this conclusion on evidence that the Wholesalers' buyers continued to purchase 5-hour Energy from the Wholesalers regardless of changes in relative prices between the Wholesalers and Costco.  This argument fails, however, because the question whether one business lost buyers to another does not shed light on whether the businesses are in competition, but only on whether there has been an injury to competition.  *See Lewis*, 355 F.3d at 531–32 (holding that to establish that two businesses are in competition, the plaintiff is not required to show that the seller's discrimination between the businesses caused buyers to switch to the favored business, because evidence of customer switching "goes to injury, and the element at issue on this appeal is the existence, not the amount of damage to, competition"); *see*

*also Volvo*, 546 U.S. at 177 (determining that the "hallmark" of competitive injury is the diversion of sales). Therefore, Dr. Williams's testimony about a lack of switching between Costco and the Wholesalers does not undermine the Wholesalers' claim that they are in competition with Costco for resales of 5-hour Energy.

Finally, Judge Miller's dissent relies on *Volvo* for the argument that even when the criteria in *Tri-Valley* are met for actual competition, a seller can show that the two customers are not in actual competition because "markets can be segmented by more than simply functional level, geography, and grade and quality of goods." But *Volvo* is inapposite. In *Volvo*, the customers (Volvo dealers) did not offer the same product to buyers in the same geographical area (*i.e.*, the *Tri-Valley* scenario). Rather, it was the buyer who chose the customers from whom it solicited bids for a possible purchase. Since the buyer at issue in *Volvo* did not solicit bids from competing Volvo dealers, they were not in competition, and so a section 2(a) violation was not possible. In short, *Volvo* tells us that there may be circumstances where the evidence shows that each customer is selling to a "separate and discrete" buyer, as in *Volvo*, or to a separate and discrete group of buyers, eliminating the possibility of competition between customers. But there is no evidence supporting such a conclusion here. Instead, this case is a typical chainstore-paradigm case where the Wholesalers and Costco carried and resold an inventory of 5-hour Energy to all comers.

Because the district court erred by finding that Costco and the Wholesalers operated at different functional levels and competed for different customers with respect to 5-hour Energy, it abused its discretion in denying injunctive relief

to the Wholesalers on that basis.[7]  *See Or. Coast Scenic R.R.*, 841 F.3d at 1072.  We therefore vacate the district court's holding as to section 2(d) and reverse and remand for the district court to consider whether Costco and the Wholesalers purchased 5-hour Energy from Living Essentials "within approximately the same period of time" in light of the record (the only remaining *Tri-Valley* requirement), *Tri-Valley Packing Ass'n*, 329 F.2d at 709, or whether the Wholesalers have otherwise proved their section 2(d) claim.

**AFFIRMED IN PART**; **VACATED, REVERSED, AND REMANDED IN PART**.[8]

---

[7] In order to obtain injunctive relief, the Wholesalers must prove "threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.  Because the district court concluded that the Wholesalers could not prove they were in competition with Costco, it held that they could not prove an antitrust injury.  On remand, the district court should consider whether there is any violation of the antitrust laws that threatens loss or damage to the Wholesalers in light of our ruling here.

[8] Each party to bear its own costs on appeal.

GILMAN, Circuit Judge, concurring in part and dissenting in part:

Contrary to the majority's decision, I am of the opinion that the district court abused its discretion in giving the "reasonably contemporaneous" instruction to the jury. I would therefore reverse the judgment of the court and remand for a new trial on the Wholesalers' Section 2(a) claim with a properly instructed jury. On the other hand, I agree with the majority that the court did not abuse its discretion in giving the "functional discount" jury instruction. Finally, I agree with the majority that the court abused its discretion in finding that Costco and the Wholesalers operated at different functional levels. In sum, I concur in vacating the court's denial of the Wholesalers' Section 2(d) claim for injunctive relief and would go further in granting a new trial on the Wholesalers' Section 2(a) claim.

The Wholesalers' secondary-line price-discrimination claim under Section 2(a) requires them to show that: (1) the challenged sales were made in interstate commerce; (2) the items sold were of like grade and quality; (3) the defendant-seller discriminated in price between favored and disfavored purchasers; and (4) "'the effect of such discrimination may be . . . to injure, destroy, or prevent competition' to the advantage of a favored purchaser." *Volvo Trucks N. Am, Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176–77 (2006) (quoting 15 U.S.C. § 13(a)).

Secondary-line price discrimination is unlawful "only to the extent that the differentially priced product or commodity is sold in a 'reasonably comparable' transaction." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1188 (9th Cir. 2016) (citing *Tex. Gulf Sulphur*

*Co. v. J.R. Simplot Co*., 418 F.2d 793, 807 (9th Cir. 1969)). To be reasonably comparable, the transactions in question must, among other things, occur "within approximately the same period of time," such that the challenged price discrimination is not a lawful response to changing economic conditions. *Tex. Gulf Sulphur*, 418 F.2d at 807 (quoting *Tri-Valley Packing Ass'n v. FTC*, 329 F.2d 694, 709 (9th Cir. 1964)); *see also England v. Chrysler Corp.*, 493 F.2d 269, 272 (9th Cir. 1974) (observing that the "reasonably contemporaneous" requirement "serves the purposes of the [Robinson-Patman] Act" by helping to ensure that price differentials "have some potential for injuring competition"). A plaintiff must show at least two contemporaneous sales by the same seller to a favored purchaser and a disfavored purchaser to make a Section 2(a) claim. *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1191 (9th Cir. 1984) (citing, *inter alia*, *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 547 (9th Cir. 1983), *overruled on other grounds as recognized in Chrona Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 657 (9th Cir. 1997)).

The Wholesalers challenge as discriminatory thousands of sales of 5-Hour Energy that Living Essentials made to Costco over the course of seven years. Living Essentials also made thousands of sales to the Wholesalers over the same time period, many of which occurred on the very same day as sales to Costco. Trial Exhibit 847, a spreadsheet of all of Living Essentials' sales during the relevant time period, documents each of these transactions (approximately 95,000 transactions in total).

Although the spreadsheet is extensive, it is fairly self-explanatory, not an "unexplained mass" as it is characterized by the majority. Each transaction appears on a separate line,

with the date, the name of the buyer, the type of buyer ("wholesaler" or "Costco," for example), the number of bottles purchased, and the price all clearly indicated.  This evidence establishes that thousands of sales to Costco and to the Wholesalers occurred in close proximity over the course of the entire seven-year period, which more than satisfies the Robinson-Patman Act's requirement that the challenged sales be reasonably contemporaneous.  *Cf. Airweld*, 742 F.2d at 1192 ("Airweld never proved when the sales actually occurred and therefore that they were contemporaneous to its purchases.").

Yet the majority concludes that the Wholesalers failed to meet their burden to establish contemporaneous sales because they "did not direct the district court to any evidence to substantiate their claim" until their post-trial motion for judgment as a matter of law, and even then the Wholesalers failed to "clearly identify any reasonably contemporaneous sales."  The majority concedes that "[t]here may have been a needle—or even many needles—in the haystack of sales data."  But the majority concludes that "[i]t was not the district court's job to hunt for them."  In fact, however, there were many thousands of needles (contemporaneous sales data) in the evidentiary haystack of Trial Exhibit 847, so the court did not have to "hunt for them"—the data was staring the court in the face for all to see.

Moreover, by focusing only on whether the Wholesalers "identified any pair of sales that would satisfy their burden," the majority fails to account for the full record in the trial court.  The comprehensive sales data was referenced frequently at trial—indeed it was the centerpiece of much of the proceedings.  To offer just one example, Living Essentials' expert witness, Dr. Williams, engaged in an

extensive analysis of the "sales data" by "look[ing] at every single day between 2012 and 2018."

In light of this evidence, I see no justification to characterize the transactions in this case as anything other than reasonably contemporaneous. And I am not aware of any authority supporting the proposition that the sufficiency of the evidence for a jury instruction turns on how thoroughly counsel discussed certain evidence at trial, so long as it is properly admitted (which is the case here). Nor did Living Essentials offer any contrary evidence to place the issue back in dispute. In other words, giving the contemporaneous-sales instruction was unwarranted because the Wholesalers introduced unrefuted evidence that the sales were in fact contemporaneous. *Cf. Desrosiers v. Flight Int'l of Fla. Inc.*, 156 F.3d 952, 959 (9th Cir. 1998) ("The district court could not have abused its discretion unless there was no factual foundation to support . . . an instruction."). As the Wholesalers rightly pointed out, "[t]here is literally no evidence to suggest that Living Essentials' sales of 5-Hour Energy to Costco and Plaintiffs occurred at anything other than the same time."

The majority disagrees, holding that the district court properly ruled that the price differential could be explained (and therefore rendered lawful) by the fact that sales of 5-Hour Energy were declining overall. They further speculate that the Wholesalers might have "bought the product during periods of higher market pricing that Costco avoided." But declining overall sales is a market condition that would have affected all purchasers for resale and, more importantly, the price differential remained consistent throughout the seven-year period over which the Wholesalers and Costco bought 5-Hour Energy from Living Essentials. The record provides no basis to support the proposition that fluctuations in

demand could account for price differentials between transactions that occurred on the same day.

Parties are "entitled to an instruction about [their] theory of the case if it is supported by law and has foundation in the evidence." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (quoting *Dang v. Cross*, 422 F.3d 800, 804–05 (9th Cir. 2005)); *see also Mayflower Ins. Exch. v. Gilmont*, 280 F.2d 13, 16 (9th Cir. 1960) (holding that when "no evidence warrant[s] the giving of the instruction in question[,] the giving of that instruction must be held to be error"). Faced with the evidence outlined above, no reasonable juror could conclude that the transactions in this case were other than contemporaneous. No separation in time between transactions can account for the difference between the higher price offered to the Wholesalers and the lower price offered to Costco. That is what matters for the purposes of the Robinson-Patman Act, which targets price discrimination between "competing customers," *England v. Chrysler Corp.*, 493 F.2d 269, 272 (9th Cir. 1974), in "*comparable transactions*," *Tex. Gulf Sulphur Co. v. J.R. Simplot Co.*, 418 F.2d 793, 806 (9th Cir. 1969) (emphasis in original) (quoting *FTC v. Borden Co.*, 383 U.S. 637, 643 (1966)), in order to combat "the perceived harm to competition occasioned by powerful buyers," *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175 (2006).

The Wholesalers clearly objected to the "reasonably contemporaneous" instruction, and I find no evidence to support giving that instruction. I am therefore of the opinion that so instructing the jury was an abuse of the district court's discretion. *See Clem*, 566 F.3d at 1181. And the Wholesalers need not have challenged the district court's denial of their entire post-trial renewed motion for judgment

as a matter of law in order for us to remand for a new trial on the basis of this instructional error; the very fact that they "objected at the time of trial on grounds that were sufficiently precise to alert the district court to the specific nature of the defect" is sufficient. *See Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1015 (9th Cir. 2007) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 51.

Nor was the district court's error harmless. In the event of instructional error, prejudice is presumed, and "the burden shifts to [the prevailing party] to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231, 1243 (9th Cir. 2021) (quoting *Clem*, 566 F.3d at 1182). In this case, the jury was told to "find for the Defendants" if it determined that Living Essentials' sales to the Wholesalers and to Costco were not reasonably contemporaneous. And Living Essentials highlighted these instructions in their closing argument, calling the Wholesalers' failure to present evidence of contemporaneous sales "fatal to their claim." There is "no way to know whether the jury would [have] return[ed] the same [verdict] if the district court" had not given the "reasonably contemporaneous" instruction. *See id.* at 1244–45. I would therefore reverse the judgment of the court and remand for a new trial on the Wholesalers' Section 2(a) claim with a properly instructed jury.

MILLER, Circuit Judge, dissenting in part:

I agree that the district court did not abuse its discretion in instructing the jury on the section 2(a) claims, but I do not agree that the district court erred in rejecting the section 2(d) claims. I would affirm the judgment in its entirety.

Under section 2(d), if two or more customers of a seller compete with each other to distribute that seller's products, the seller may not pay either customer "for any services or facilities furnished by or through such customer in connection with the . . . sale" of the products unless the payment "is available on proportionally equal terms to all other customers competing in the distribution of such products." 15 U.S.C. § 13(d); *see Tri-Valley Packing Ass'n v. FTC*, 329 F.2d 694, 707–08 (9th Cir. 1964). Unlike section 2(a), section 2(d) does not require "a showing that the illicit practice has had an injurious or destructive effect on competition." *FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 65 (1959). But it does demand that the favored and the disfavored customer be "competing" with each other. 15 U.S.C. § 13(d).

The district court did not clearly err in finding that the Wholesalers failed to establish by a preponderance of the evidence that they were competing with Costco. (The district court was wrong to suggest that the jury's verdict compelled this conclusion, but the court expressly stated that its finding also rested on an "independent review of the evidence," and we may uphold it on that basis.) We have previously held that "customers who are in functional competition in the same geographical area, and who buy the seller's products

of like grade and quality within approximately the same period of time, are in actual competition with each other in the distribution of these products." *Texas Gulf Sulphur Co. v. J.R. Simplot Co.*, 418 F.2d 793, 807 (9th Cir. 1969) (quoting *Tri-Valley Packing Ass'n*, 329 F.2d at 709). We have not set out a definitive definition of "functional competition," and the Wholesalers argue that they need only show a "'competitive nexus,' whereby 'as of the time the price differential was imposed, the favored and disfavored purchasers competed at the same functional level, *i.e.*, all wholesalers or all retailers, and within the same geographic market.'" (quoting *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 585 (2d Cir. 1987)).

Such a capacious understanding of competition is foreclosed by the Supreme Court's decision in *Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006). There, the Court clarified that a common position in the supply chain in a shared geographical market is not sufficient, by itself, to establish actual competition. *Id.* at 179 ("That Volvo dealers may bid for sales in the same geographic area does not import that they in fact competed for the same customer-tailored sales."). Thus, it is not enough to point to evidence of "sales in the same geographic area." *Id.* Instead, the evidence must show that the disfavored buyer "compete[d] with beneficiaries of the alleged discrimination *for the same customer*." *Id.* at 178. Consistent with *Volvo*, other circuits have held that "two parties are in competition only where, after a 'careful analysis of each party's customers,' we determine that the parties are 'each directly after the same dollar.'" *Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191, 197 (3d Cir. 2010)

(quoting *Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 214 (3d Cir. 2007)); *see also M.C. Mfg. Co. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1068 n.20 (5th Cir. 1975) ("Competition is determined by careful analysis of each party's customers. Only if they are each directly after the same dollar are they competing.") (quoting *Ag-Chem Equip. Co., v. Hahn, Inc.*, 350 F. Supp. 1044, 1051 (D. Minn. 1972), *aff'd in part, vacated in part*, 480 F.2d 482 (8th Cir. 1973)).

In this case, Living Essentials presented evidence of substantial differences in operations that suggests that the Wholesalers and Costco were not competing "*for the same customer.*" *Volvo*, 546 U.S. at 178. For example, unlike Costco, most of the Wholesalers sold 5-hour Energy only in store, negotiated pricing with their customers—offering in-house credit and different prices for 5-hour Energy—and sold only to retailers, not to end-consumers. Meanwhile, Costco Business Centers sold both in store and online at set prices to any consumer with a Costco membership, some of whom were end-consumers; in addition, they carried fewer than half of the 5-hour Energy flavors carried by the Wholesalers, and they did not sell 5-hour Energy display racks or other retailer-oriented accessories for Living Essentials. It is true that Costco Business Centers sold most of their 5-hour Energy to retailers. But it is far from clear that Costco sold to the *same* retailers as the Wholesalers. The Wholesalers' distinct features, such as their credit and wider inventory, may well have appealed to different customers.

Expert testimony corroborated that evidence. The parties offered dueling experts on the issue of competition. For the Wholesalers, Dr. Gary Frazier, a marketing expert, opined

that the purchasers did compete based on his review of emails sent by Living Essentials' employees discussing sales, the testimony of six of the seven Wholesalers, and maps showing the locations of the Wholesalers, their customers, and the seven Costco Business Centers. But on cross-examination, Dr. Frazier acknowledged that he did not speak with any of the Wholesalers' customers, and that the maps on which he relied included all of the Wholesalers' customers in a cluster of unlabeled dots without regard to whether the customer ever purchased 5-hour Energy or the actual travel time for the customer to get to a Wholesaler versus one of the seven Costco Business Centers. The district court found that the Costco Business Centers and the Wholesalers were in close proximity to each other, and I do not question that finding. But the court was not required to accept Dr. Frazier's inference that their 5-hour Energy customers were the same.

For Living Essentials, Dr. Darrel Williams, an expert in industrial organization and economics, testified that a "necessary condition for competition is that the buyers consider the two sellers substitute[s]," and he opined that this "necessary condition" was absent. After analyzing Living Essentials' sales records, the sales data provided by four of the Wholesalers, and the Wholesalers' customer data, Dr. Williams concluded that the Wholesalers did not compete with Costco for sales of 5-hour Energy. His analysis showed that even though some Wholesalers priced 5-hour Energy above the prices of other Wholesalers and Costco, the Wholesalers' customers did not switch to the seller with the cheapest product; from the lack of any economically significant customer loss, he inferred that the Wholesalers'

customers did not treat Costco as a substitute supplier of 5-hour Energy. He determined that the maximum level of customer switching across the Wholesalers and Costco was ten times lower than the switching attributable to ordinary customer "churn," and that even the opening of three new Costco Business Centers had no statistically significant effect on the Wholesalers' 5-hour Energy sales. Dr. Williams posited that operating differences between the Wholesalers and Costco might explain why their customers differed. He reasoned that the Wholesalers might draw customers interested in buying on credit or in the unique products the Wholesalers offer. In its ruling on the Wholesalers' motion for judgment as a matter of law, the district court summarized this testimony by explaining that "[b]ecause customers are presumed to purchase a product at the lowest available price, the jury could reasonably conclude this evidence tended to show Costco and Plaintiffs did not compete for the same customers."

The Wholesalers respond that Dr. Williams's testimony goes only to whether there was competitive injury, not whether there was competition in the first place. But that is a misreading of the testimony. Based on his conclusion that the Wholesalers' customers were not sensitive to the price of 5-hour Energy, Dr. Williams opined that the Wholesalers and Costco did not compete "*for the same customer*." *Volvo*, 546 U.S. at 178; *see Lewis v. Philip Morris Inc.*, 355 F.3d 515, 531 (6th Cir. 2004) (explaining that studies of price sensitivity are helpful for assessing competition).

To be sure, the district court was not required to credit Living Essentials' evidence and Dr. Williams's economic

analysis of the sales data over the Wholesalers' evidence and Dr. Frazier's examination of emails and maps. But it did not clearly err in doing so and in finding that the Wholesalers failed to carry their burden. *See United States v. Frank*, 956 F.2d 872, 875 (9th Cir. 1991) ("Clear error is not demonstrated by pointing to conflicting evidence in the record.").

In reversing the denial of an injunction, the court deems all of the evidence of lack of actual competition—and the district court's findings based on that evidence—to be irrelevant. It relies on our decision in *Tri-Valley Packing*, in which we said that where two direct customers of a seller both "operat[e] solely on the same functional level," if "one has outlets in such geographical proximity to those of the other as to establish that the two customers are in general competition, and . . . the two customers purchased goods of the same grade and quality from the seller within approximately the same period of time," then it is not necessary to trace the seller's goods "to the shelves of competing outlets of the two in order to establish competition." 329 F.2d at 708. Instead, "[a]ctual competition in the sale of the seller's goods may then be inferred." *Id.*

As the court reads *Tri-Valley Packing*, the "confluence of facts" of operating on the same functional level, being in geographic proximity, and reselling goods of like grade and quality is sufficient to conclusively establish competition, making any other evidence irrelevant. But what we said in *Tri-Valley Packing* is that actual competition "may . . . be inferred," 329 F.2d at 708, not that it "shall be irrebuttably presumed."

Nowhere in *Tri-Valley Packing* did we say that a defendant is barred from rebutting the inference of competition by presenting evidence that two resellers at the same functional level and in the same geographic area are not, in fact, in actual competition with each other. If we had, our insistence in *Tri-Valley Packing* on a showing of "functional competition," which I have already discussed, would have been superfluous. 329 F.2d at 709. Reading *Tri-Valley Packing* in that way is contrary to the economic reality that markets can be segmented by more than simply functional level, geography, and grade and quality of goods. Some differences in operations may not matter to customers, but others are undoubtedly significant. (In the New York geographic market, you can order a Coke both at Le Bernardin and at McDonald's, but no one thinks they are engaged in actual competition.)

The court's approach is also contrary to *Volvo*, which says that section 2(d) requires competition "*for the same customer*." 546 U.S. at 178. It is contrary to the decisions of other circuits that have recognized that finding competition requires "a careful analysis of each party's customers," not the application of a categorical rule. *Feesers, Inc.*, 591 F.3d at 197 (internal quotation marks omitted). And it is unsupported by the Federal Trade Commission's interpretation of section 2(d). In regulations defining "competing customers," the FTC gives the following illustrative example: "B manufactures and sells a brand of laundry detergent for home use. In one metropolitan area, B's detergent is sold by a grocery store and a discount department store." 16 C.F.R. § 240.5. Under the court's reading of *Tri-Valley Packing*, the grocery store and the

discount department store would necessarily be in competition with each other. But that is not how the FTC sees it. Instead, the agency says, "*If* these stores compete with each other, any allowance, service or facility that B makes available to the grocery store should also be made available on proportionally equal terms to the discount department store." *Id.* (emphasis added); *see also FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 62 (1959) (emphasizing the FTC's factual finding that the putative competitors were indeed "retailing the identical product to substantially the same segment of the public" (quoting *Simplicity Pattern Co. v. FTC*, 258 F.2d 673, 677 (D.C. Cir. 1958), *aff'd in part, rev'd in part*, 360 U.S. 55 (1959)). The presence or absence of competition must be assessed based on the facts.

The district court appropriately reviewed all of the evidence in making a finding that Living Essentials had not established competition. Because that finding was not clearly erroneous, I would affirm the judgment in its entirety.